## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | |
| BARRY G. ISAACSON, | |
| Debtor, | Case No. 21-13466 |
| MICHAEL OKUN, individually and in his capacity as Trustee of the Michael D. Okun Revocable Trust of December 27, 2012, | Chapter 7 |
| | The Honorable Judge Benjamin Goldgar |
| Plaintiff, | Adv. No.: |
| v. | |
| BARRY G. ISSACSON, | |
| Defendant. | |

### COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT, UNDER
### SECTION 523 OF THE UNITED STATES BANKRUPTCY CODE

Plaintiff, Michael Okun ("**Okun**"), in his capacity as the Trustee of the Michael D. Okun Revocable Trust of December 27, 2012 (the "**Trust**"), by and through his attorneys, Howard L. Adelman and Adam P. Silverman, of the law firm of Adelman & Gettleman, Ltd., bring the following causes of action against Debtor-Defendant, Barry G. Isaacson (the "**Debtor**"), and in support thereof, respectfully make the following allegations:

### JURISDICTION

1.  This Court has jurisdiction over the above-captioned adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334.

2.  This is a core proceeding under 28 U.S.C. § 157(I).

3.  Venue of the above-captioned adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      This court has authority to enter final judgments in this adversary proceeding, and Okun and the Trust consents thereto pursuant to Federal Rules of Bankruptcy Procedure Rule 7008.

## NATURE OF CASE

5.      On November 26, 2021, the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**"), designated as Case No. 21-13466 (the "**Bankruptcy Case**") [Dkt. No. 1].

6.      On August 26, 2022, the Bankruptcy Court entered an Order in the Bankruptcy Case extending the deadline to object to discharge and dischargeability to December 8, 2022 [Dkt. No. 78].

7.      This case involves a manager-managed Illinois limited liability company, The Premier Property Team LLC ("**Premier**"), which the Trust and the Debtor own equally.

8.      At all times relevant hereto the Debtor was the manager of Premier. As the manager, the Debtor had sole control over Premier's operations, finances, and books and records.

9.      The Debtor used his position as manager to engage in a course of misconduct that includes, but is not limited to: (a) self-dealing, (b) diverting assets for his own personal benefit and/or the benefit of his family, (c) usurping corporate opportunities, (d) failing to maintain accurate books and records, (e) failing to maintain company-wide tax obligations, which include the timely filing of Premier's tax returns, and (f) a near absolute nonobservance of Premier's operating agreement.

10.     As a member owning fifty percent (50%), Okun is unable to effect change at Premier through voting or otherwise without the consent of the Debtor.

1221052v2

11.     On January 21, 2021, Okun initiated pre-petition state court litigation against the Debtor with allegations relating to those brought herein. That suit included counts for breach of contract relating to the operating agreement, breach of fiduciary duty, equitable accounting, and breach of contract relating to the promissory note.

12.     On October 19, 2022, Okun filed proof of claim #3-1 ("**Claim 3-1**") for $341,969.04 citing breach of a promissory note and breach of fiduciary duty as the basis for the claim.[1] In addition, Claim 3-1 states that Okun is entitled to additional amounts due to it from the Debtor as damages arising from Debtor's breach of fiduciary duty as outlined in the pending state court litigation.

## PARTIES

13.     Okun is an individual and is a citizen of the State of Illinois.

14.     The Debtor is an individual and is a citizen of the State of Illinois. The Debtor's schedules reflect that he resides at 2586 Union Ct. Long Grove, IL 60047.

15.     Premier is an Illinois limited liability company with its principal office location at the Debtor's residence, 2568 Union Court, Long Grove, Illinois 60047.

## FACTUAL ALLEGATIONS

**A.     Through the Trust, Okun Invests $425,000 into Premier and Becomes a 50% Member**

16.     The Illinois Secretary of State indicates that Premier was established on January 26, 2011.

17.     Premier is a construction business that provides maintenance and construction services primarily to commercial properties.

---

[1] The state court litigation is in the record attached to Proof of Claim 3-1.

1221052v2

18.     On October 13, 2016, the Debtor and Okun executed that certain *Amended and Restated Operating Agreement* for Premier (the "**Operating Agreement**"). A true and correct copy of the Operating Agreement is attached hereto as **Exhibit A** and expressly incorporated herein.

19.     The Operating Agreement reflected that the Trust owned a thirty-three percent (33%) membership interest in Premier.

20.     In exchange for the membership interest in Premier, the Trust contributed Two Hundred Twenty-Five Thousand Dollars ($225,000) as its capital contribution.

21.     On or about June 12, 2017, the Debtor and the Trust executed another agreement related to Premier titled *Capital Contribution and Member Loan Agreement and Amendment to Operating Agreement* (the "**Capital Contribution Loan Agreement**"). A true and correct copy of the Capital Contribution Loan Agreement is attached hereto as **Exhibit B** and expressly incorporated herein.

22.     The Capital Contribution Loan Agreement amended the Operating Agreement and issued the Trust an additional seventeen percent (17%) membership interest in Premier in exchange for providing it with a Two Hundred Thousand Dollar ($200,000) line of credit that was secured by a promissory note (the "**Note**"). A true and correct copy of the Note is attached hereto as **Exhibit C** and expressly incorporated herein.

23.     Accordingly, after June 12, 2017, the Debtor and the Trust each owned fifty percent (50%) membership interests in Premier and the Premier owed the Trust Two Hundred Thousand Dollars ($200,000) pursuant to the Note.

4

1221052v2

24.     As the manager of Premier, the Debtor owed Okun fiduciary duties of loyalty and care pursuant to the Illinois Limited Liability Company Act. 805 ILCS 180/15-3; *see also* Ex. A, ¶8.5.

25.     The Operating Agreement allows Okun to recover reasonable attorneys' fees and expenses if the Court finds that the Debtor is in breach of the Operating Agreement. *See* Ex. A, ¶16.5.

> 16.5 <u>Legal Fees and Expenses.</u> If any party hereto is in breach of any representation or warranty or defaults in the performance of any of its or his covenants, agreements or obligations described in this Agreement, then in addition to any and all other rights or remedies which the non-defaulting party may have against the defaulting party, the defaulting party shall be liable to and shall pay to the non-defaulting party a sum equal to the non-defaulting party's court costs and reasonable attorneys' fees and expenses incurred in enforcing the covenants, agreements or obligations of the defaulting party described in this Agreement.

**B.     The Debtor breaches the Operating Agreement by making several unauthorized distributions**

26.     Article 7 of the Operating Agreement[2] governs allocations and distributions. Paragraph 7.7 states that members voting no fewer than 81% of shares are necessary to approve distributions of cash Premier holds on hand. *See* Ex. A, ¶7.7.

27.     The Operating Agreement does not permit cash distributions unless both the Debtor and the Trust agree to them.

28.     Even if the Trust consented to a distribution, which it did not, the Operating Agreement requires that Premier pay the Note in full before the Debtor can receive distributions. *See* Ex. A, ¶7.8.

> <u>Distribution of *C*apital Proceeds and Liquidity Event Proceeds.</u> The Company shall make distributions…to the Members as set forth below…:

---

[2] The terms "Article X" and "Paragraph X" are used as citations to the Operating Agreement (Exhibit A).

1221052v2

**(a)**      first, to the Okun Trust or its Permitted Transferee to the extent of its Unrecovered Capital, so as to return all Unrecovered Capital to the Okun Trust;

**(b)**      the remainder, if any, among the Members in accordance to their Percentage Interests.

29.     From as early as 2016, the Debtor has engaged unauthorized distributions in violation of Paragraph 7.7.

30.     Sometime in or about January 2016 to before the Debtor filed for bankruptcy the Debtor used unauthorized distributions to make regular periodic payments for vehicles driven by himself and family members. The vehicles include:

    a.   a BMW X-5 for his wife Leslie;

    b.   two separate two-door Mercedes, one for the Debtor and the other for his daughter Sloan; and

    c.   both a Honda Element and a Jeep for his other daughter Rachel.

31.     Sometime in or about January 2016 to before the Debtor filed for bankruptcy the Debtor used unauthorized distributions to remodel his and his family member's personal residences. The Debtor remodeled his:

    a.   own home adding a two-floor expansion that included a ground-level three-car garage and second floor bedrooms;

    b.   daughter's Indiana residence by adding a tile backsplash in the kitchen, new lighting, and a vaulted ceiling;

    c.   son Jacob's home in Detroit; and

    d.   other daughter's Chicagoland area home, which included fully updated kitchen with new cabinets and floors; stair modification; and a bathroom remodel.

6

32.     Each of the remodeling jobs utilized Premier's materials, vehicles, equipment, and staff. Neither the Debtor nor his family reimbursed Premier for the projects detailed above.

33.     Sometime in or about January 2016 to before the Debtor filed for bankruptcy the Debtor used unauthorized distributions for noncompany related personal expenditures. The unauthorized distributions included the Debtor:

   a.   depositing $140,000 of company funds into his personal account;

   b.   paying for his daughter's wedding, which included him purchasing a $10,000 necklace for his wife;

   c.   giving his daughter $15,000 to assist her in purchasing her Chicagoland home;

   d.   paying off his children's student loan debt;

   e.   purchasing a $3,500-$3,700 riding lawn mower delivered directly to his personal residence; and

   f.   purchasing two peloton stationary bikes.

34.     As the sole manager of Premier, the Debtor was responsible for running its day-to-day operations. *See* Ex. A, ¶7.1(a).

35.     The Debtor also was responsible for maintaining Premier's books and records, finances, personal property, and bank accounts. *Id*.

36.     Pursuant to Paragraph 7.1(b), the Debtor was required to "close" Premier's books of account promptly at the end of each fiscal year, which was a calendar year, and to cause Premier to hire a certified public accountant to perform an annual compilation (i.e., to convert Premier's data into financial statements). *See* Ex. A, ¶7.1(b).

37.     Promptly after the certified public accountant completed the compilation, the Debtor was required to provide Okun with a written report ("**Written Report**"), which was to

7

include: (a) a year-end balance sheet, (b) a statement of income and expenses for the year, (c) a statement of changes in member's capital accounts, and (d) such statements with respect to the status of Premier and the allocations of profits and losses as were necessary to advise all members properly about their investment in Premier. *Id*.

38.    From 2016, Okun periodically but no less than several times a year requested the Written Report from the Debtor and, in breach of Paragraph 7.1(b), the Debtor never gave Okun (or caused Premier to give Okun) *any* of the year-end Written Reports. *See* Ex. F, J, and I, Emails from Okun requesting information.

39.    The Debtor's failure to deliver any of the annual Written Reports prevented Okun from learning the true nature of the Debtor's misconduct as manager of Premier.

40.    In or about April 2019, Okun discovered that Premier might have failed to file its 2018 tax return with the Internal Revenue Service.

41.    Consequently, due to his concerns pertaining to the taxes, on August 20, 2019, Okun inquired of the Debtor in writing as to whether Premier had filed its 2017 and 2018 tax returns. *See* Ex. D, Email from Okun to the Debtor dated Aug. 20, 2019.

42.    In furtherance of the Debtor's fraudulent conduct to conceal the true nature of his misconduct as manager, the Debtor, to date, has ignored Okun's requests regarding taxes or the Written Reports.

43.    The Debtor further has refused to provide Okun with any information relating to the finances or operations of Premier.

44.    The Debtor's refusal to provide Okun with meaningful information allowed the Debtor to continue to divert Premier's revenue and assets away from Premier in violation of the Operating Agreement.

1221052v2

**C.    The Debtor took active steps to conceal his breaches of the Operating Agreement from Okun**

45.    Article 8 governs management of the company. *See* Ex. A, ¶8. Paragraph 8.2(a) states that the managers have sole control over the management and business affairs of Premier. *Id*.

46.    Paragraph 8.4(a) states that the Debtor, as manager, has no authority to do any act in breach of the Operating Agreement. *See* Ex. A, ¶8.4(a).

47.    In addition to violating Paragraph 8.4(a), the Debtor's unauthorized distributions violate other subsections of Paragraph 8.4. *See* Ex. A ¶ 8.4(c) (unauthorized to use company property for non-company purposes), 8.4(j) (unauthorized to make distributions without Okun's consent), 8.4(p) (unauthorized to make capital expenditures in excess of $10,000), 8.4(q) (unauthorized to incur any expenditure in excess of $10,000), and 8.4(s) (unauthorized compensation or guaranteed payments to manager).

48.    Paragraph 8.5 states that the Debtor cannot engage in fraudulent, reckless, grossly negligent conduct, or intentional misconduct that adversely affects Premier. *See* Ex. A, ¶8.5. Paragraph 8.12 states that the Debtor may not act in a manner that is competitive to Premier. *See* Ex. A, ¶8.12.

49.    The Debtor competed with Premier by undertaking projects in his own name while still using the equipment, materials, staff, and other assets of Premier. Premier could have undertaken such projects.

50.    On or about March 15, 2018, the Debtor further competed with Premier by forming Premier Property Plumbing, LLC an Illinois limited liability company ("**Premier Plumbing**").

9

1221052v2

51.     Upon information and belief, once the Debtor formed Premier Plumbing he transferred Ten Thousand Dollars ($10,000) from Premier to Premier Plumbing without any consideration and without Okun's consent or knowledge.

52.     Since the formation of Premier Plumbing, the Debtor has been diverting construction and maintenance contracts that otherwise would have been entered into by Premier to Premier Plumbing.

53.     The Debtor's actions after the formation of Premier Plumbing demonstrated the imbalance of knowledge and power between the Debtor and Okun.

54.     The Debtor's unilateral decision to form Premier Plumbing and divert its contracts away from Premier negatively affected both Premier and Okun.

55.     The Debtor deposited all revenue derived from these contracts with Premier Plumbing outside the reach of Premier.

56.     Okun's only avenue to learn about the operations of Premier or the formation of Premier Plumbing was through information provided by the Debtor or employees of Premier.

57.     Okun's requests for information from the Debtor were either ignored or nonresponsive violating Paragraph 9.3. *See* Ex. A, ¶9.3; Ex. E-J, Emails from Okun requesting information.

58.     The Debtor further demonstrated the imbalance of power by taking additional steps to prevent Okun from being meaningfully informed.

59.     The Debtor instructed employees not to discuss anything relating to Premier Plumbing in the presence of Okun.

60.     The Debtor instructed Premier employees to turn Okun away and deny his access to Premier's offices.

10

1221052v2

61.     The Debtor's refusal to transmit information to Okun made it nearly impossible for Okun to learn about the Debtor's actions.

62.     Due to the actions of the Debtor, Premier has suffered damages in the form of loss of and/or diminution in the value of its assets and interests.

## <u>COUNT I</u>
### 11 U.S.C. § 523(a)(2)(A) – Actual Fraud Regarding Concealment of affairs of Premier and the Existence of Premier Plumbing

63.     Okun adopts paragraphs 1 through and including 62 of the Complaint as paragraph 63 of Count I of the Complaint as though fully set forth herein.

64.     Section 523(a)(2)(A) of the Bankruptcy Code provides, in relevant part, "A discharge … does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by…actual fraud…"

65.     The Debtor siphoned away Premier's assets by making several unauthorized distributions.

66.     The Debtor created Premier Plumbing and used it as a means to divert profits away from Premier and Okun.

67.     The Debtor took active steps to ensure Okun would not learn of his unauthorized distributions to Premier Plumbing.

68.     The Debtor's actions constitute actual fraud.

69.     The totality of the circumstances demonstrate that the Debtor intended to defraud Okun and the fraud created the alleged debt that is the subject of this discharge dispute.

WHEREFORE, for the foregoing reasons, Okun respectfully request that the Court enter an Order: (a) liquidating the amount of funds obtained by the Debtor through the unauthorized

11

distributions to himself and his family, the loss of business opportunities due to projects being

diverted to Premier Plumbing, and the loss of business opportunities due to projects being

diverted to the Debtor himself; (b) pursuant to 11 U.S.C. 523(a)(2)(A) exempting from discharge

the Debtor's debts and obligations to Okun alleged herein and arising from the allegations herein

in amount determined by the Court; (c) for Okun's court costs, reasonable attorney's fees, and

expenses; and (d) providing such further relief as is just.

<u>**COUNT II**</u>
**11 U.S.C. § 523(a)(4) – Fraud and Defalcation While Acting as Okun's Fiduciary**

70.     Okun adopts paragraphs 1 through and including 62 of the Complaint as

paragraph 70 of Count II of the Complaint as though fully set forth herein.

71.     Section 523(a)(4) of the Bankruptcy Code provides, in relevant part, "A discharge

… does not discharge an individual debtor from any debt for fraud or defalcation while acting in

a fiduciary capacity, embezzlement…"

72.     The Debtor demonstrated that there was an imbalance of knowledge and power

when he ignored Okun's requests for information, instructed employees not to discuss Premier

Plumbing in front of Okun, and instructed employees to deny Okun's access to Premier's offices.

73.     By virtue of this, the Debtor had a position of ascendancy over Okun.

74.     The Debtor's actions would have left Okun with no avenue to learn about the

operations of Premier or the existence of Premier Plumbing had the Debtor been successful in his

efforts.

75.     The Debtor possesses absolute power to command Premier as he sees fit. Okun is

utterly incapable of making a single change at Premier without the Debtor's consent.

1221052v2

76.     The totality of the circumstances demonstrate that the Debtor intended to compete with Premier, conceal the existence of Premier Plumbing, and conceal his unauthorized distributions in violation of his fiduciary duties.

77.     At all times relevant hereto the Debtor was a fiduciary of Okun.

78.     As Okun's fiduciary, the Debtor abused his position in a manner that warrants nondischargeability.

WHEREFORE, for the foregoing reasons, Okun respectfully request that the Court enter an Order (a) pursuant to 11 U.S.C. 523(a)(4) exempting from discharge the Debtor's debts and obligations to Okun alleged herein and arising from the allegations herein in amount determined by the Court; (b) for Okun's court costs, reasonable attorney's fees, and expenses; and (c) providing such further relief as is just.

## <u>COUNT III</u>
### 11 U.S.C. § 523(a)(4) – Embezzlement

79.     Okun adopts paragraphs 1 through and including 62 of the Complaint as paragraph 79 of Count III of the Complaint as though fully set forth herein.

80.     The Debtor has committed embezzlement by appropriating the unauthorized distributions for his personal benefit without the Okun's consent.

81.     Okun entrusted the Debtor with a $425,000 investment in the hopes that he, among other things, would grow the company, uphold his fiduciary duties, and fairly split the profits.

82.     The Debtor demonstrated deceit and an intent to deceive by performing actions to prevent Okun's discovery of the unauthorized distributions to ensure he could continue his misconduct for years to come.

1221052v2

WHEREFORE, for the foregoing reasons, Okun respectfully request that the Court enter an Order: (a) liquidating the amount of funds embezzled by the Debtor through the unauthorized distributions to himself and his family, the loss of business opportunities due to projects being diverted to Premier Plumbing, and the loss of business opportunities due to projects being diverted to the Debtor himself; (b) pursuant to 11 U.S.C. 523(a)(4) exempting from discharge the Debtor's debts and obligations to Okun alleged herein and arising from the allegations herein in amount determined by the Court; (c) for Okun's court costs, reasonable attorney's fees, and expenses; and (d) providing such further relief as is just.

## <u>COUNT IV</u>
### 11 U.S.C. § 523(a)(6) – Willful and Malicious Injury

83.     Okun adopts paragraphs 1 through and including 62 of the Complaint as paragraph 83 of Count IV of the Complaint as though fully set forth herein.

84.     Section 523(a)(6) of the Bankruptcy Code provides, in relevant part, "A discharge … does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity…"

85.     Okun has suffered injuries due to the Debtor's failure to cause Premier to give proper distributions. Specifically, Okun has missed years of distributions and the value of Premier has declined.

86.     The totality of the circumstances demonstrate that the Debtor's actions were willful and that he acted with the intent to injure Okun.

87.     The Debtor's actions in causing injury to Okun were malicious in that he acted in conscious disregard of his fiduciary duties or without just cause or excuse.

WHEREFORE, for the foregoing reasons, Okun respectfully request that the Court enter an Order (a) pursuant to 11 U.S.C. 523(a)(6) exempting from discharge the Debtor's debts and

1221052v2

obligations to Okun alleged herein and arising from the allegations herein in amount determined

by the Court; (b) for Okun's court costs, reasonable attorney's fees, and expenses; and (c)

providing such further relief as is just.

DATED: December 08, 2022                    Respectfully submitted,


                                            Howard L. Adelman


                                            By: /s/ Howard L. Adelman
                                                  One of his attorneys

HOWARD L. ADELMAN, ESQ. (ARDC #0015458)
ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ADELMAN & GETTLEMAN, LTD.
53 W. Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel. (312) 435-1050
Fax (312) 435-1059
**Attorneys to Michael Okun, individually
and in his capacity as Trustee of the
Michael D. Okun Revocable Trust of
December 27, 2012**

1221052v2

# Exhibit A

FILED DATE: 1/21/2021 9:08 AM   2019L013339

THE UNITS OF MEMBERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE, BUT HAVE BEEN ISSUED PURSUANT TO EXEMPTIONS UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS.   ACCORDINGLY, THE SALE, TRANSFER, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF ANY OF SAID UNITS IS RESTRICTED AND MAY NOT BE ACCOMPLISHED EXCEPT IN ACCORDANCE WITH THIS AGREEMENT AND AN APPLICABLE REGISTRATION STATEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE BOARD OF MANAGERS THAT REGISTRATION IS UNNECESSARY.

## AMENDED AND RESTATED OPERATING AGREEMENT

### OF

### THE PREMIER TEAM LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (the **"Agreement"** or **"Operating Agreement"**) is effective as of October _13_, 2016, by and among **THE PREMIER TEAM LLC**, an Illinois limited liability company (the "Company") and each of the "Members", and shall regulate the affairs of the Company the conduct of its business, and in connection therewith, the relations among its "Members" and "Manager(s)".

<u>RECITALS:</u>

WHEREAS, the Company was organized as a limited liability company under and pursuant to the laws of the State of Illinois for the purposes hereinafter stated;

WHEREAS, concurrently herewith, pursuant to a Capital Contribution Agreement (**"Contribution Agreement"**) of even date herewith the Michael D. Okun Revocable Trust dated December 27, 2012, as amended (the **"Okun Trust"**) is purchasing and the Company is issuing to the Okun Trust Membership Interests and Units representing a 33% Percentage Interests;

WHEREAS, the parties have reached an understanding concerning various aspects of: (a) their business relationship with each other; and (b) the organization and operation of the Company and its business;

WHEREAS, the parties intend this Agreement to control, to the extent stated or fairly implied, the business and affairs of the Company, including the Company's governance structure and the Company's dissolution, winding up, and termination, as well as the relations among the Company's Members; and

WHEREAS, this Agreement amends, restates and supersedes all prior operating agreements of the Company.

FILED DATE: 1/21/2021 9:08 AM    2019L013339

## AGREEMENTS

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

### ARTICLE I
### Definitions

1.1    Definitions.  Capitalized words and phrases used in this Agreement have the following meanings:

"**Act**" means the Limited Liability Company Act of the State of Illinois, as amended from time to time

"**Adjusted Capital Account**" means, with respect to any Member or Assignee, the Capital Account (as defined in Section 7.2) of such Member or Assignee, increased by (i) the amount of the Member's or Assignee's share of partnership minimum gain (within the meaning of Treasury Regulations Section 1.704-2(g)(1)), (ii) the amount of the Member's or Assignee's share of partner non-recourse debt minimum gain (within the meaning of Treasury Regulations Section 1.704-2(i)(5)) and (iii) any amount obligated to be restored to such Capital Account pursuant  to this Agreement or Treasury Regulation Section 1.704-1(b)(2)(ii)(c).

"**Affiliate**" means, with respect to any Person, (i) any other Person that directly or indirectly controls or holds the power to vote ten percent (10%) or more of the outstanding voting securities of such first Person; (ii) any other Person ten percent (10%) or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote by such first Person; (iii) any other Person directly or indirectly controlling, controlled by, or under common control with such first Person; or (iv) any officer, director or partner of such first Person; and (v) if such other Person is an officer, director or partner, any business entity for which such other Person acts in any such capacity.  For purposes of the foregoing, "control" means the power, direct or indirect, to direct or cause the direction of the management and policies of a Person or entity through voting securities, contract or otherwise.

"**Assignee**" means an assignee or transferee who receives one or more Units, or any separate rights thereunder, as a result of a Transfer pursuant to the terms of this Agreement or applicable law, but who is not admitted as a Member pursuant to the terms of Section 12.1 below, or a Member who has withdrawn, dissociated or been expelled from the Company.  A holder of Units who has been designated an "Assignee" will have such designation reflected on Exhibit A.

"**Available Cash**" means such cash or cash equivalents on hand and in banks as the Super Majority Members, in their discretion, determines is then available for distribution to the Members of the Company after all current debts and obligations of the Company have been paid or provision therefor has been made and reserves have been established for any purpose deemed appropriate by the Super Majority Members, in their sole discretion

"**Business Day**" means any day other than a Saturday or Sunday, a legal holiday or a day on

2

FILED DATE: 1/21/2021 9:08 AM   2019L013339

which commercial banks in Chicago, Illinois are authorized or required by law to be closed.

"**Capital Contributions**" means, with respect to any Interest Holder, the amount of money and the fair market value of any other property contributed to the Company with respect to the Unit(s) of Membership Interests or Economic Interests held by such Interest Holder pursuant to the terms of this Agreement. The principal amount of an installment obligation or promissory note which is not readily traded on an established securities market and which is contributed to the Company by the obligor shall not be included in the Capital Contribution of any Interest Holder until the Company makes a taxable disposition of the obligation or note or (and to the extent) principal payments are made on the obligation or note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

"**Capital Event**" means the sale, exchange or other disposition of all or substantially all of the assets of the Company, a merger, consolidation, reorganization or recapitalization of the Company, or a liquidation, dissolution or other event which terminates the existence of the Company.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any corresponding provisions of succeeding law.

"**Company**" means the limited liability company governed by this Agreement.

"**Dissociation Date**" means the date of the occurrence of a Dissociation Event.

"**Dissociation Event**" means, with respect to any Member, (i) such Member's withdrawal pursuant to Section 12.2 below, or (ii) the occurrence of an Involuntary Transfer with respect to any of such Member's Units.

"**Economic Interest**" means an Assignee's right to share in the profits, losses or similar items of income, gain, loss, deduction or credit arising out of the business of, and to receive distributions from, the Company, but does not include any other rights of a Member, including, without limitation, the right to vote or to participate in the management of the Company, or, except as specifically provided in this Agreement or required under the Act, any right to information concerning the business and affairs of the Company.

"**Fiscal Year**" means, with respect to the Company, the calendar year.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by an Interest Holder to the Company shall be the gross fair market value of said asset, as determined by the contributing Interest Holder and the Super Majority Members, in a manner that is consistent with Section 7701(g) of the Code;

(b)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Super Majority Members, in a manner that is consistent with Section 7701(g) of the Code, as of the following times: (a) the acquisition

FILED DATE: 1/21/2021 9:08 AM   2019L013339

of an additional Membership Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution or as consideration for the performance of services on behalf of the Company; (b) the distribution by the Company to an Interest Holder of more than a de minimis amount of property other than money as consideration for a Membership Interest or Economic Interest, as applicable; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only in the event that the Super Majority Members reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Interest Holders in the Company;

(c)      The Gross Asset Value of any Company asset distributed to any Interest Holder shall be the gross fair market value (taking Section 7701(g) of the Code into account) of such asset on the date of distribution; and

(d)      The Gross Asset Values of any Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) of the Code or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and the definition of Capital Account in Section 7.2; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the TMP determines that an adjustment pursuant to the foregoing subparagraph (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to the foregoing subsections (a), (b) or (d), such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Insolvent**" or "**Insolvency**" means, with respect to any Person, that such Person has made an assignment for the benefit of creditors; filed a voluntary petition in bankruptcy; been adjudged a bankrupt or insolvent, or had entered against such Person an order of relief in any bankruptcy or insolvency proceeding; filed a petition or an answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; filed an answer or other plea admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding of such nature; sought, consented to, or acquiesced in the appointment of a trustee, receiver, or liquidator of such Person or of all or any substantial part of his properties; sixty (60) days have elapsed after the commencement of any proceeding against such Person seeking reorganization, arrangement, or similar relief under any statute, law, or regulation and such proceeding has not been dismissed; or sixty (60) days have elapsed since the appointment without such Person's consent or acquiescence of a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties and such appointment has not been vacated or stayed or the appointment is not vacated within sixty (60) days after the expiration of such stay.

"**Involuntary Transfer**" means, with respect to any Interest Holder, any nonvolitional Transfer of Units whatsoever and, by way of example and not by way of limitation, shall be deemed

FILED DATE: 1/21/2021 9:08 AM   2019L013339

to occur if: (i) an Interest Holder is subject to bankruptcy; (ii) an Interest Holder's Units are subject to Transfer pursuant to a divorce or separation decree, property settlement, or any other form of judicially approved marital arrangement; (iii) an Interest Holder's Units are subject to Transfer pursuant to the foreclosure of any lien or other security interest; (iv) an Interest Holder's Units are subject to Transfer pursuant to judicial sale; or (v) an Interest Holder's Units are otherwise subject to Transfer by operation of law other than as a result of an Interest Holder's death or disability.

"**Interest Holder**" means either a Member or an Assignee.

"**Legal Representative**" means, (i) with respect to a disabled Interest Holder, an agent of a disabled Interest Holder acting pursuant to a valid power of attorney, or if none, the legally appointed guardian of a disabled Interest Holder, and (ii) with respect to a deceased Interest Holder, the Person with the authority to sell, transfer or otherwise handle the assets of such deceased Interest Holder's estate.

"**Liquidity Event**" means, excluding the LLC's ordinary course operations, all events which generate cash for the LLC including, without limitation, a Sale and a cash-out refinance.

"**Liquidity Event Proceeds**" means all proceeds from a Liquidity Event less transaction costs and expenses and reasonable reserves for future contingencies.

"**Majority in Interest**" means, with respect to the relevant Members, those Members holding at least fifty and one-tenth percent (50.1%) of the aggregate issued and outstanding Units entitled to approve, consent to or vote on such matter.

"**Manager**" means each Person executing this Agreement as a Manager and any other Person subsequently appointed or elected to serve as a Manager of the Company as provided in Section 8.1(b) below and within the meaning of a "manager" of a "manager-managed" limited liability company pursuant to the Act.

"**Member**" means each Person executing this Agreement as a Member and any other Person subsequently admitted to the Company as a Member as provided in Section 12.1 below.

"**Membership Interest**" means a Member's ownership interest in the Company pursuant to this Agreement and within the meaning of the Act, including, without limitation, such Member's interest in the Company's capital, profits, losses, income, deductions, credits and other tax items and cash distributions, as applicable.

"**Net Profits**" and "**Net Losses**" mean the net book income or net book loss, as the case may be, of the Company including all items of income or loss, such as Code Section 705(a)(2)(B) expenditures and items of nontaxable income, determined in accordance with the principles for computing "book" income and "book" loss under Treasury Regulations Section 1.704-1(b)(2)(iv); provided, however, that the following items shall be excluded from the computation of Net Profits and Net Losses: (i) items allocated under the "qualified income offset" pursuant to Section 7.5(b); (ii) "non-recourse deductions" and "partner non-recourse deductions" pursuant to Section 7.5(c); (iii) items allocated under the "minimum gain chargeback" pursuant to Section 7.5(d); and (iv) items allocated under the "non-recourse debt minimum gain chargeback" pursuant to Section 7.5(e). If the Gross Asset Value of any Company

FILED DATE: 1/21/2021 9:08 AM   2019L013339

asset is adjusted pursuant to subparagraph (ii) or (iv) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses.

"**Percentage Interest**" means, at any time, a fraction, (a) the numerator of which is the number of Units (regardless of class) held by the relevant Member(s) (or where expressly indicated, the relevant Assignee(s) of any such Units) and (b) the denominator of which is the total number of Units (regardless of class) held by all of the Members (and where expressly indicated, all of the Assignees).

"**Permitted Transferee**" means, with respect to a transferring Member (i) such Member's spouse and lineal descendants and the spouses of such lineal descendants; (ii) if such Member is a trust, the current beneficiaries, their lineal descendants and the spouses of the current beneficiaries; (iii) if such Member is an entity other than a trust, the owners of such entity (e.g., shareholders, members or partners) as of the date such Member is admitted to the Company as a Member; (iv) any trust in which all of the current beneficiaries consist of any one or more of such Member and the Persons described in the preceding subsection (i) and (ii); and (v) any entity other than a trust in which all of the voting rights and ownership interests are continuously held, directly or indirectly, by any one or more of such Member and the Persons described in the preceding subsections (i), (ii), (iii) and (iv).

"**Person**" means any individual, corporation, partnership, limited liability company, trust, estate, unincorporated organization, association or other entity.

"**Resignation**" means a Manager's resignation or otherwise disengaging from all activities with the Company (other than by reason of death or disability).  To the extent the Manager is also an officer or an employee of the Company, a "**Resignation**" shall include such Person's voluntary cessation of full-time employment.

"**Subsidiary**" of any Person means any other Person of which the first Person (i) owns a majority of the outstanding voting stock or similar equity interests, directly or indirectly, or (ii) otherwise controls, whether through the ownership of interests, contract or otherwise.

"**Super Majority Members**" means the Members holding in the aggregate in excess of eighty percent (80%) of all Units outstanding at the time of any determination.

"**Transfer**" means, when used as a noun, any sale, hypothecation, pledge, assignment, gift, or other transfer, be it voluntary or involuntary, to any Person, inter vivos, testamentary, by operation of laws of devise and descent or other laws, and, when used as a verb, to sell, hypothecate, pledge, assign, gift, or otherwise transfer to any Person, be it voluntarily or involuntarily, inter vivos, testamentary, by operation of the laws of devise or descent or any other laws.

"**Treasury Regulations**" means the income tax regulations, including temporary regulations, promulgated under the Code, as amended, and any corresponding provisions of succeeding regulations.

"**Unit**" means a representation of a Member's Membership Interest (or any separate rights thereunder) or an Assignee's Economic Interest (or any separate rights thereunder), as applicable, in

FILED DATE: 1/21/2021 9:08 AM   2019L013339

the Company's capital, profits, losses, tax items and cash distributions and all rights, duties, liabilities and obligations in connection therewith, expressed as a unit. The Units are Common Units, subject to the authority of the Super Majority Members to create and issue other classes of Units pursuant to Section 6.3.

"**Unrecovered Capital**" of a Member means the excess, if any, of the aggregate Capital Contributions made by the Member, less the sum of all distributions made to such Member by the Company.

1.2   Terms Defined Elsewhere Herein. Capitalized words and phrases used in this Agreement and not otherwise defined in this Article shall have the meanings ascribed to them elsewhere in this Agreement.

## ARTICLE II
## Continuation of Company

2.1   Statutory Authority. The parties hereto do hereby agree to continue the Company as a limited liability company pursuant to this Agreement and under and pursuant to the provisions of the Act.

2.2   Filings. The Managers have caused Articles of Organization conforming to the requirements of the Act to be executed and filed in the Office of the Secretary of State of the State of Illinois (the "**Office of the Secretary of State**"), and the Managers shall make such other filings and recordings and do such other acts and things conforming thereto as shall constitute compliance with all requirements for the formation of a limited liability company under the Act and the laws of such other states in which the Company elects to do business, including without limitation, amending the Articles of Organization to provide for the Managers as provided in Section 8.1.

## ARTICLE III
## Name, Offices, Registered Agents and Company Records

3.1   Name. The name of the Company shall be the name set forth in the heading of this Agreement. The affairs of the Company shall be conducted under the Company name or such other name as the Super Majority Members may, in its discretion, select in accordance with the Act. The Managers shall execute and file with the proper offices any and all certificates required by the fictitious name or assumed name statutes of the states in which the Company elects to do business. The Company shall have the exclusive ownership of and right to use the Company name (and any name under which the Company shall elect to conduct its affairs) as long as the Company continues.

3.2   Principal Office of the Company. The principal office of the Company shall be located at such place within or outside the State of Illinois as the Super Majority Members may from time to time designate. The Company may have subsidiary offices in such other place or places as may be selected from time to time by the Super Majority Members.

3.3   Registered Office and Registered Agent. The name and address of the Company's registered agent in Illinois shall be Brian D. LeVay, 55 West Monroe Suite 1100,

FILED DATE: 1/21/2021 9:08 AM    2019L013339

Chicago, IL 60603.  The Super Majority Members may from time to time in accordance with the Act change the Company's registered agent and/or registered office.

3.4    Records to be Maintained.  The Managers shall at all times during the continuance of the Company keep at the Company's principal office the following records, which shall be subject to inspection and/or copying at the request and at the expense of any Member or Legal Representative during ordinary business hours:

(a)    a list of the full name and last known address of each Interest Holder, setting forth the amount of cash each Interest Holder has contributed or has agreed to contribute in the future, a description and statement of the agreed value of the other property or services each Interest Holder has contributed or has agreed to contribute in the future and the date on which each became a Member or an Assignee, as applicable;

(b)    a copy of the Articles of Organization, as amended or restated, together with executed copies of any powers of attorney under which any article, application or certificate has been executed;

(c)    copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;

(d)    copies of this Agreement and any amendments hereto; and

(e)    copies of any financial statements of the Company for the three most recent years.

## ARTICLE IV
## Purpose of the Company

The purpose of the Company shall be to provide and perform construction services and such other purposes as may be determined by the Super Majority Members from time to time, including the ownership of other entities.  The Company shall have the power to do all acts and things necessary or useful in connection with the foregoing.

## ARTICLE V
## Term of Existence and Dissolution of the Company

5.1    Term of Existence of the Company.  The term of existence of the Company commenced upon the filing of the Articles of Organization of the Company with the Office of the Secretary of State and shall be perpetual unless the Company is dissolved as provided in Section 5.2 below.

5.2    Dissolution.  Subject to the terms of this Agreement generally and Article XIII in particular governing the conduct of the parties during the winding up of the Company, the Company shall dissolve and commence winding up and liquidating pursuant to Article XIII upon the occurrence of any one or more of the following (each a "**Dissolution Event**"):

8

FILED DATE: 1/21/2021 9:08 AM    2019L013339

(a)    upon the sale or other disposition of all or substantially all of the Company's non-cash assets; provided, however, that in the event that such sale or other disposition involves the receipt of a deferred payment obligation, whether or not secured, or payment in whole or in part in kind, then at the election of the Super Majority Members, the term of the Company shall not end, and it shall continue, subject to the other provisions hereof, until the earlier of the time that: (i) the deferred payment obligation shall have been paid in full; (ii) the in-kind considerations received by the Company shall have been sold or otherwise converted to cash; or (iii) the Super Majority Members elects to terminate the Company and distribute the deferred payment obligation or in kind considerations;

(b)    if the Super Majority Members shall so determine;

(c)    an event that makes it unlawful for all or substantially all of the business of the Company to be continued under the Act;

(d)    the entry of a judicial decree; or

(e)    the administrative dissolution of the Company pursuant to the Act, unless the Company is reinstated promptly following receipt by the Managers of notice of such administrative dissolution.

5.3    Dissociation by a Member.  The occurrence of a Dissociation Event with respect to a Member shall not result in the dissolution of the Company, but such Member shall: (a) immediately cease to be a Member of the Company and shall be deemed to be an Assignee; (b) if applicable, cease to be a Manager of the Company; and (c) automatically be deemed to have Resigned from any position as an employee, agent or independent contractor of the Company, or as a trustee of any employee benefit plan of the Company.

ARTICLE VI
Contributions to Capital

6.1    Capital Contributions.

(a)    Each Interest Holder's Capital Contribution in respect of such Person's Units shall be set forth opposite such Person's name on Exhibit A hereto, as amended from time to time.

(b)    Except as required by the Act, no Interest Holder shall be assessed for Capital Contributions, provided that the Interest Holders may, upon the express consent of the Super Majority Members, at any time or from time to time, make additional Capital Contributions to the Company.

(c)    In addition to the foregoing, the amount of any state or local tax which is required to be paid or withheld by the Company with respect to any Member's or Assignee's allocable share of the income of the Company shall be assessed to such Member or Assignee, who shall pay the same to the Company forthwith upon demand of the Super Majority Members.  Each Member and Assignee hereby indemnifies the

9

FILED DATE: 1/21/2021 9:08 AM    2019L013339

Company and every other Member and Assignee and agrees to hold them harmless from any liability or loss they might incur by virtue of any such tax with respect to such Member's or Assignee's allocable share of the income of the Company.

6.2    Units of Membership Interests and Economic Interests.   The Interest Holders, in exchange for their respective Capital Contributions or services rendered to the Company, shall receive the respective Units set forth opposite their names on Exhibit A hereto, as amended from time to time.   Each Unit shall entitle the holder thereof to an interest in the Company's capital, profits, losses, tax items and cash distributions and all rights, duties, liabilities and obligations in connection therewith, as provided in this Agreement.   Each Unit, regardless of class, shall entitle the holder thereof (provided that such holder is a Member of the Company) to a single vote with respect to each matter on which such Member is entitled to vote as provided in this Agreement; provided, however, that an Assignee shall not be entitled to vote on matters submitted to a vote of the Members.

6.3    Issuance of Additional Units; Preemptive Rights.   If the Super Majority Members determine that the Company requires capital in excess of amounts required or agreed to be contributed to the Company hereunder, then subject to the provisions of this subsection, the Company may issue additional Units in the Company and any other equity securities of the Company or any security convertible into or exchangeable for or carrying rights or options to purchase any other equity securities of the Company based upon the fair market value of said Units or other securities at the time of issuance in exchange for additional Capital Contributions. Further, the Super Majority Members may issue additional Units or other such securities in the Company in connection with an acquisition, joint venture or strategic alliance or otherwise not involving the raising of equity capital, or for any other purpose.   Units may be issued as a single class or in one or more classes, and with such rights, powers, restrictions and limitations as the Super Majority Members shall determine (and the Interest Holders hereby grant the Managers the power of attorney to amend this Agreement to effect any such classification of Units adopted by the Super Majority Members pursuant to this Section).   In the event the Super Majority Members elects to issue additional Units, any other equity securities of the Company or any security convertible into or exchangeable for or carrying rights or options to purchase any other equity securities of the Company as aforesaid, then the Managers shall give the Members written notice of the proposed issuance of Units or such other securities at least 30 days prior thereto and the Members shall be entitled to purchase (on the same terms as the Company proposes to issue such additional Units or other securities) such Units or other securities in the Company in proportion to their then Percentage Interests (the Members' **"Preemptive Rights"**) which rights must be exercised and the purchase of additional Units or such other securities must be purchased within 30 days following the date of such written notice of the proposed issuance; provided, however, that the Members shall not have Preemptive Rights with respect to:

(a)    additional Units or such other securities issued in connection with an acquisition, joint venture, merger or strategic alliance;

(b)    additional Units or such other securities issued to a financial institution or its Affiliates in connection with a debt financing to which the Company is a party;

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(c)      additional Units or such other securities issued in connection with a Unit split or a distribution of Units or other such securities in kind to all holders on a pro rata basis;

(d)      additional Units or such other securities issued to employees or consultants of the Company pursuant to Section 6.4; or

(e)      any right, option or warrant to acquire any security convertible into the Units or other securities described in the foregoing clauses (a) through (d).

In the event that any Member shall fail to exercise such Preemptive Rights with respect to any proposed issuance of Units or such other securities within the time period set forth, such Member shall not have any further Preemptive Rights and shall forever waive the Preemptive Rights granted hereunder with respect to any future issuance of Units or such other securities. Upon the issuance of additional Units or other such securities in the Company pursuant to this section, the Managers are authorized to adjust the Percentage Interests of the Members, as applicable, to reflect the dilution required in connection with such issuance, provided that any such dilution shall be in proportion to the Members' Relative Percentage Interests, and shall not result in any adjustment in the Capital Accounts of the Members whose Percentage Interests are diluted.

6.4      Issuance of Units for Services Rendered and Other Purposes.  The Super Majority Members, in their discretion, shall have the right to issue Units as compensation or in exchange for services rendered to the Company, and establish purchase, option, bonus, compensation, phantom plans and other plans pursuant to which employees and/or consultants of the Company may be granted or sold Units.  Upon the issuance of additional Units in the Company pursuant to this section, the Managers are authorized to adjust the Percentage Interests of the Members, as applicable, to reflect the dilution required in connection with such issuance, provided that any such dilution shall be in proportion to the Members' Relative Percentage Interests.

6.5      Certificates for Units.  In the discretion of the Super Majority Members, the Units may be (but need not be) represented by a certificate.  The exact contents of such certificates shall be determined by the Super Majority Members.

6.6      Member Loans to the Company.  Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company ("Member Loan").  If any Member shall advance any funds to the Company upon consent of the Super Majority Members, the amount of any such advance shall not be deemed a Capital Contribution of the Member, but shall be a debt due from the Company to the Member to be repaid at the times and with the interest, payment terms and collateral that the Super Majority Members determines to be reasonable.

## ARTICLE VII
### Allocations and Distributions

7.1      Books of Account.

(a)      At all times during the continuance of the Company, the Managers shall cause proper and true books of account to be maintained wherein there shall be entered

11

FILED DATE: 1/21/2021 9:08 AM   2019L013339

particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's business, and all of such other transactions, matters and things relating to the business of the Company as are usually entered in books of account kept by persons engaged in a business of like kind and character.

(b)     The books of account shall be closed promptly after the end of each Fiscal Year and an annual compilation shall be performed at the expense of the Company by a certified public accountant selected by the Managers.  Promptly thereafter, a written report shall be given to each Member, which shall include a balance sheet of the Company as of the end of such Fiscal Year, a statement of income and expenses for such Fiscal Year, a statement of changes in Members Capital Accounts and such statements with respect to the status of the Company and the allocation of profits and losses as shall be necessary to advise all Members properly about their investment in the Company.

(c)     Promptly after the close of the Fiscal Year, the Company shall cause to be prepared such partnership income tax and other returns required under applicable law and regulation, including any and all statements necessary to advise all Members about their investment in the Company for federal income tax reporting purposes.  The Managers shall be responsible for the prompt filing and delivery of all such returns and statements.

7.2    Capital Accounts.  As part of the Company's books of account, an individual **"Capital Account"** shall be maintained for each Interest Holder at all times in accordance with applicable provisions of the Code and Treasury Regulations, including, without limitation, Treasury Regulations Section 1.704-1(b)(2)(iv).

7.3    Varying Percentage Interests.  In the event of any changes in any Member's or Assignee's Percentage Interest during the Fiscal Year, the Super Majority Members shall have the right to select any method of determining the varying interests of the Members and Assignees during the Fiscal Year which satisfies Code Section 706(d) and the Treasury Regulations promulgated thereunder.

7.4    Profit and Loss Allocations.  The Net Profit and Net Losses of the Company shall be allocated among the Interest Holders in a manner that will, after taking into account the special allocations set forth in Section 7.5, cause their respective Capital Accounts to equal, as closely as possible, the sum of (a) the respective amounts that would be distributable to them under Section 7.6, if the Company then was able to distribute available cash (as defined in Section 7.6) in the priorities set forth in Section 7.6 and (b) the amount that would be distributed to them pursuant to Sections 13.3 and 7.6 if the Company sold all remaining assets (following the distribution of amount referred to in the preceding clause (a)) for their Gross Asset Value and distributed the proceeds thereof.

7.5    Special Allocations.  Except as provided in the following subsections, Company income, gain, loss, deduction, credit and other tax items shall be allocated to the Interest Holders in the same manner as the corresponding "book" items are allocated pursuant to Section 7.4 above:

12

FILED DATE: 1/21/2021 9:08 AM    2019L013339

(a)    In accordance with Code Sections 704(b) and 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any asset contributed to the capital of the Company shall be allocated to the Interest Holders so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution to the Company.

(b)    No allocation of loss or deduction shall be made to an Interest Holder to the extent such allocation causes or increases a deficit Adjusted Capital Account balance at the end of the Fiscal Year to which such allocation relates; such loss or deduction shall instead be allocated among the other Interest Holders in accordance with their relative Percentage Interests, subject to the limitations of this sentence. In determining the extent to which the previous sentence is satisfied, such Interest Holder's Adjusted Capital Account shall be reduced for adjustments, allocations and distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6). In the event an Interest Holder unexpectedly receives such an adjustment, allocation or distribution, the "qualified income offset" provided for in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) shall apply.

(c)    Non-recourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) shall be allocated in accordance with the Interest Holders' Percentage Interests, pursuant to Treasury Regulations Section 1.704-2(e)(2). Non-recourse deductions attributable to partner non-recourse debt (within the meaning of Treasury Regulations Section 1.704-2(b)(4)) shall be allocated to the Interest Holder(s) that bear the economic risk of loss for such debt in accordance with Treasury Regulations Section 1.704-2(i)(1).

(d)    If there is a net decrease in partnership minimum gain (within the meaning of Treasury Regulations Section 1.704-2(d)) during a Fiscal Year, then the "minimum gain chargeback" as set forth in Treasury Regulations Section 1.704-2(f) shall apply.

(e)    If there is a net decrease in partner non-recourse debt minimum gain (within the meaning of Treasury Regulations Section 1.704-2(i)(3)) during a Fiscal Year, then the "partner minimum gain chargeback" as set forth in Treasury Regulations Section 1.704-2(i)(4) shall apply.

(f)    An Interest Holder's share of the liabilities of the Company shall be determined under Code Section 752 and the Treasury Regulations promulgated thereunder. For purposes of allocating excess non-recourse liabilities under Treasury Regulations Section 1.752-3, the Interest Holders' "interests in . . . profits" shall be their Percentage Interests. In the discretion of the Super Majority Members, excess non-recourse liabilities may be allocated to the Interest Holders in accordance with the manner in which it is reasonably expected that the deductions attributable to those non-recourse liabilities will be allocated.

7.6    Tax Distributions. Subject to the restrictions of Section  , the Company shall make a tax distribution ("**Tax Distribution**") of Available Cash of an amount which, in the

FILED DATE: 1/21/2021 9:08 AM   2019L013339

Super Majority Members determine, is sufficient to permit the Members to pay federal and state income taxes attributable to income allocated to them pursuant to this Article VII assuming each Member is subject to the highest marginal federal and state income tax rates applicable to Persons in the State of Illinois and giving effect to the character of income and deductibility of state income taxes for federal income tax purposes.   Tax Distributions may be made in advance of the determination of net income based upon the Company's reasonable estimate of such net income.  Tax Distribution shall be made within ninety (90) days following the end of the fiscal year of the Company. Tax Distributions shall be deemed made before any other distributions are made and shall be subject from time to time to subsequent adjustment pursuant to tax audit, litigation settlement, amended return, or the like.

7.7   Distributions of Available Cash.  The Super Majority Members may from time to time declare that the Company distribute some or all of the Available Cash to the Members. Each such distribution shall be made to the Members in accordance with Section 7.8 .

7.8   Distribution of Capital Proceeds and Liquidity Event Proceeds.   The Company shall make distributions of Capital Proceeds and Liquidity Event Proceeds to the Members as set forth below, and distributions made pursuant to this Section 7.8 shall serve to offset the Company's obligations to make distributions pursuant to Section 7.6:

(a)   first, to the Okun Trust or its Permitted Transferee to the extent of its Unrecovered Capital, so as to return all Unrecovered Capital to the Okun Trust;

(b)   the remainder, if any, among the Members in accordance to their Percentage Interests.

7.9   Limitation on Distributions.   Notwithstanding any provision to the contrary contained in this Article VII, no distribution shall be made pursuant to Section 7.6 or Section 7.8, (a) if such distribution would violate the Act, or (b) if, after giving effect to such distribution, (i) the Company would be Insolvent, or (ii) the net assets of the Company would be less than zero. The Super Majority Members may base a determination that a distribution is made in compliance with clauses (a) and (b) of the preceding sentence if said distribution is made in good faith reliance upon a balance sheet and income statement of the Company represented to be correct by the Person having charge of the Company's books of account or by an outside accountant regularly engaged by the Company.

7.10   Amounts Withheld.  Any amount withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution (whether under this Article VII or Article XIII) by the Company to the Members and Assignees shall be treated as amounts distributed to the Members and Assignees for all purposes under this Agreement.

7.11   Right of Set-Off.  The Super Majority Members may set-off any distribution for any past-due obligation of a Member or Assignee to the Company or for any past-due obligation of a transferor (immediate or remote) of a Member or Assignee to the extent such Person knew of such obligation.

ARTICLE VIII
Management of the Company

14

FILED DATE: 1/21/2021 9:08 AM    2019L013339

8.1    <u>The Managers</u>.

(a)    Effective as of the date of this Agreement, the Managers shall consist of one (1) Manager and, thereafter, such additional individuals as may be determined from time to time by the Super Majority Members.  Effective as of the date of this Agreement the Manager of the Company shall consist of Barry Isaacson ("**Isaacson**").  A Manager shall serve as a Manager until such Person is unwilling or unable to serve.

(b)    At such time as a Manager's position is vacant, the Super Majority Members of the remaining Members shall appoint a successor Manager.  If a Manager resigns or is unable to serve as Manager, the Manager's responsibilities shall be undertaken by the other Manager, if any.  If all Managers resign or is unable to serve, the Managers' authorities and responsibilities shall be undertaken by the Super Majority Members until such time as another Manager is appointed.  A Manager need not be a Member or a resident of the State of Illinois.  A Person's ceasing to serve as a Manager shall not affect such Person's rights as a Member, if any.

8.2    <u>General Management</u>.

(a)    The Company shall be "manager-managed" within the meaning of the Act and, except as otherwise provided in this Agreement (including, without limitation, under <u>Section 8.4</u>), the management and control of the business affairs of the Company shall be made solely by the Managers.  Except as otherwise expressly provided herein (including, without limitation, under <u>Section 8.2(b)</u> and <u>Section 8.7</u>), the majority consent or affirmative vote of the Managers shall govern with respect to matters permitting or requiring the consent or vote of the Managers hereunder.  Any Managers' action shall be set forth in writing and executed by the Manager(s) whose approval is required to effect said action. Each Manager shall be entitled to one (1) vote on each matter submitted to the vote of the Managers or in a written consent to take action without a meeting of the Managers.  At any meeting of the Managers, the presence in person or by telephone of Managers possessing at least a majority of the votes in the aggregate shall constitute a quorum for the transaction of business.

(b)    No creditor, vendor or other Person dealing with the Company shall be required to investigate the authority of the Managers or secure the approval or confirmation of any Member as to any act of the Managers in connection with the conduct of the Company's business.  Any Person dealing with the Company may rely upon a certificate signed by the Managers as to: (i) the identity of the Managers or Interest Holders; (ii) the existence or non-existence of any fact which constitutes a condition precedent to acts by the Managers or which are in any other manner germane to the affairs of the Company; (iii) the Persons who are authorized to execute and deliver any instrument or document of the Company; or (iv) any act or failure to act by the Company or any other matter whatsoever involving the Company.

8.3    <u>Authority of Managers</u>.  Subject to such limitations as may be imposed by this Agreement or by operation of law (including, without limitation, under <u>Section 8.4</u>), the Managers shall: (i) manage the affairs and business of the Company; (ii) exercise the authority

FILED DATE: 1/21/2021 9:08 AM   2019L013339

and powers granted to the Company except as otherwise provided in this Agreement or by applicable law; and (iii) otherwise act carry out and implement any and all of the purposes of the Company. Subject to such limitations as may be imposed by this Agreement or by operation of law (including, without limitation, under <u>Section 8.4</u>), acts of the Managers shall include, without limitation:

> (a)   effectuate this Agreement and the resolutions and decisions of the Members;

> (b)   direct and supervise the operations of the Company;

> (c)   cause the Company to pay for the expenses incurred by it as a going concern;

> (d)   not less often than monthly, keep the Members advised in all matters pertaining to the Company's operation, operating income and expense and financial position;

> (e)   open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

> (f)   pay any and all organization, capital, and operating costs and expenses, and management fees of the Company.

8.4   <u>Actions Requiring Super Majority Members' Consent</u>. Notwithstanding anything in this Agreement to the contrary, the Managers, without the prior written consent of the Super Majority Members, shall have no authority to do any of the following:

> (a)   do any act in contravention of this Agreement;

> (b)   change the purpose of the Company as set forth in <u>Article IV</u> above;

> (c)   possess Company property, or assign rights in specific property, for other than a Company purpose.

> (d)   the making of any agreement, contract, obligation, promise or undertaking (whether oral or written and whether express or implied) on behalf of the Company that requires it to pay an amount in excess of $20,000 in any twelve (12)-month period, has a term of greater than twelve (12) months, or is not terminable by the Company on thirty (30) days' prior written notice or less;

> (e)   vote the Company's member interest or shares of stock in any other entity in which the Company has a member, stock or another interest;

> (f)   cause the Company to sell additional Member Interests or Units to such Persons at such prices and upon such terms as the Managers deems appropriate from time to time and such Member Interests or Units may be identical to or different than those in effect now or any time in the future;

16

FILED DATE: 1/21/2021 9:08 AM    2019L013339

(g)    the creation, authorization, designation, reclassification, modification, issuance or sale of any class or series of Membership Interests or rights, options, warrants or other securities convertible into or exchangeable for any Interests or any "phantom" equity or equity appreciation rights;

(h)    the admission of any Person as a Member of the Company;

(i)    redeem any Member's Member Interest;

(j)    make distributions to the Members (except as required by this Agreement);

(k)    make any decision related to the tax status of the Company, or any actions involving tax issues;

(l)    require an additional Capital Contribution from any Member without its consent;

(m)    the creation, incurrence or assumption of any indebtedness for borrowed money of the Company (which shall include for purposes hereof capitalized lease obligations and guarantees or other contingent obligations for indebtedness for borrowed money) other than trade payables and accrued expenses incurred in the ordinary course of business;

(n)    the mortgage, encumbrance, creation or incurrence of any encumbrance or lien on the Company's assets;

(o)    the repayment of any outstanding indebtedness of the Company except when due in accordance with its terms and in connection with any refinancing, extension, renewal or refunding of such indebtedness on terms that are at least as favorable to the Company as the terms of the indebtedness being refinanced;

(p)    the making of capital expenditures in excess of $10,000 in any 12-month period;

(q)    incurring any expenditure in excess of $10,000;

(r)    the settlement of any claim against the Company in an amount in excess of $5,000;

(s)    Any compensation or guaranteed payment paid to a Manager or Member;

(t)    the hiring of any employee, or the engagement of any consultant, independent contractor or other Person who shall provide services to the Company, to whom the Company would pay more than $50,000 in any twelve (12)-month period, or the modification or amendment of any existing employment or other similar service arrangement with any such Person;

17

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(u)     the adoption of or increase in the payments or benefits payable under any profit-sharing, bonus, deferred compensation, savings, insurance, pension, retirement or other employee benefit plan for or with any employees or other service providers of the Company;

(v)     the filing or consent to the filing of a petition for or against the Company under any federal or state bankruptcy, insolvency or reorganization act;

(w)     the initiation of a lawsuit by the Company;

(x)     the confession of any judgment against the Company;

(y)     the amendment of the Company's Articles of Organization or this Agreement;

(z)     the voluntary dissolution and winding up of the Company;

(aa)    sell, transfer, assign, exchange or dispose of all or any substantial part of the Company's assets not in the ordinary course of business;

(bb)    the merger or consolidation of the Company with or into another entity or the entering into of any share exchange (or similar transaction) between the Members and another Person or Persons;

(cc)    the change of the Company's principal line of business;

(dd)    amend the Operating Agreement of the Company in any manner which would affect the contents of this Section 8.4; or

(ee)    other actions expressly described herein that require the approval of the Members.

8.5     Standard of Care.  The duty of care of each Manager, officer, employee or agent of the Company in the discharge of such Person's duties to the Company and the Interest Holders is limited to refraining from engaging in fraudulent or reckless or grossly negligent conduct or intentional misconduct which materially, adversely affects the Company.  In discharging his or its duties, each such Person shall be fully protected in relying in good faith upon the records maintained by the Company in accordance with this Agreement, and upon such information, opinions, reports or statements by the other Managers, officers, employees or agents, or by any other Person, as to matters such Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value of the assets, liabilities, profits or losses of the Company.  Except as otherwise set forth herein, each Interest Holder hereby holds harmless (but is under no obligation to fund additional monies) and waives any claim against each Manager, officer, employee or agent of the Company for any and all losses, damages, liability claims, causes of action, omissions, demands and expenses or any other act or failure arising out of such Person's duties as a Manager, officer, employee or agent if such Person satisfies the standard of care provided in this Section 8.5 with respect thereto.

18

FILED DATE: 1/21/2021 9:08 AM   2019L013339

**8.6**    Duties and Obligations of Managers.

(a)    The Managers shall take all actions which may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the laws of each jurisdiction in which such existence is necessary to protect the limited liability of the Interest Holders.

(b)    Each Manager shall devote to the Company such time as may be necessary for the proper performance of such Manager's duties hereunder.

(c)    The Managers shall cause the Company to conduct its business and operations separate and apart from that of any Interest Holder or other Person, including, without limitation: (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of any Interest Holder or other Person; (ii) maintaining books and financial records of the Company separate from the books and financial records of any Interest Holder or other Person; (iii) causing the Company to pay its liabilities from assets of the Company; and (iv) causing the Company to conduct its dealings with other Persons in its own name and as a separate and independent entity.

(d)    Confidentiality.  While acting as a Manager of the Company, no Manager shall, without the written consent of the Company, use for the benefit of a Manager or others, or disclose to others any Confidential Information of the Company (as defined below).  The Manager recognizes the harm that may be caused by the release or misuse of the Confidential Information, and agrees that the Company has the right to obtain injunctive relief in case a release of Confidential Information occurs or is threatened to occur.  As used herein, the term "Confidential Information" means information in any form whatsoever: (i) relating to the Company's business; (ii) which has not been published or disclosed by the Company to the general public; and (iii) that is disclosed to, learned by, developed or prepared by the Manager as a result of or through the Manager's management of the Company, or through the agents, employees or representatives of the Company.

**8.7**    Related Party Transactions.  No contract or transaction between the Company and a Manager, between the Company and an Affiliate of a Manager, or between the Company and any other Person in which a Manager has a financial interest, shall be void or voidable solely for such reason, if the material facts as to such Manager's relationship or interest and as to the contract or transaction are disclosed to the Super Majority Members, and the Super Majority Members, in good faith, authorize the contract or transaction in accordance with the terms of this Agreement.

**8.8**    Compensation of Managers.  By approval of the Super Majority Members, a Manager may receive reasonable compensation for such Manager's services to the Company.  It is understood that any compensation paid to a Manager under the provisions of this section shall be considered as an operating expense of the Company and shall be deducted as an expense item in determining profits and losses of the Company.

**8.9**    Officers and Employees.

19

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(a)     The Super Majority Members, in their discretion, may from time to time employ and retain Persons as may be necessary or appropriate for the conduct of the Company's business, including officers, employees, agents and other Persons (any of whom may be an Interest Holder).  The Super Majority Members may delegate to any one or more such Persons any of the authorities, discretions and powers herein conferred upon the Managers, subject to revocation at any time; provided, however, that any such delegation shall not relieve the Managers of its liabilities and obligations under this Agreement.  The salaries or other compensation, if any, of the officers, employees, agents and other Persons employed by the Company shall be fixed from time to time by the Super Majority Members.

(b)     Managers, employees, agents and other individuals employed by the Company may be designated as officers of the Company, with titles including but not limited to "chief executive officer," "chairman," "president," "vice president," "treasurer," "secretary" and "chief financial officer," as and to the extent authorized by the Super Majority Members.  The officers, in the performance of their duties as such, shall owe to the Company duties of loyalty (except as set forth in Section 9.4 to the extent any officer is also a Manager, Member or any Affiliate of a Manager or Member) and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Illinois.  Any number of offices may be held by the same individual.  The Super Majority Members, in its discretion, may choose not to fill any office for any period as it may deem advisable.  Officers need not be residents of the State of Illinois or Interest Holders.  Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or disability or until such officer shall resign or shall have been removed in the manner hereinafter provided.  Any officer may resign at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  The Super Majority Members may remove any officer for any reason at any time, with or without cause.  Designation of an officer shall not of itself create any contractual employment rights.

8.10    Indemnification.

(a)     The Company shall indemnify every Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the Person is or was an Interest Holder or Manager (which terms for purposes of this Section 8.10 shall include the Interest Holder's or Manager's shareholders, members, partners, directors, managers, officers, employees, agents and affiliates), officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with the action, suit or proceeding, if the Person acted in good faith and in a manner the

20

FILED DATE: 1/21/2021 9:08 AM   2019L013339

Person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, that the Person had reasonable cause to believe that the Person's conduct was unlawful.

(b)     The Company shall indemnify every Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action or suit, by or in the right of the Company to procure a judgment in its favor by reason of the fact that the Person is or was an Interest Holder, Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection with the defense or settlement of the action or suit, if the Person acted in good faith and in a manner the Person reasonably believed to be in, or not opposed to, the best interests of the Company, provided that no indemnification shall be made in respect of any claim, issue or matter as to which the Person shall have been adjudged to be liable for fraudulent or reckless or grossly negligent conduct or intentional misconduct in the performance of the Person's duty to the Company, unless, and only to the extent that, the court in which the action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, the Person is fairly and reasonably entitled to indemnity for those expenses as the court shall deem proper.

(c)     To the extent that a Person entitled to indemnification by the Company hereunder has been successful, on the merits or otherwise, in the defense of any action, suit or proceeding referred to in subsection (a) or (b) above, or in defense of any claim, issue or matter therein, the Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by the Person in connection therewith.

(d)     Any indemnification under subsections (a) and (b) above (unless ordered by a court), shall be made by the Company only as authorized in the specific case, upon a determination that indemnification of the Person is proper in the circumstances because the Person has met the applicable standard of conduct set forth in either subsection (a) or (b) above.   The determination shall be made by: (i)) by a Super Majority Members Majority in Interest of the disinterested Members.

(e)     Expenses incurred in defending a civil or criminal action, suit or proceeding may be paid by the Company in advance of the final disposition of the action, suit or proceeding, as authorized by the Super Majority Members in the specific case, as provided in subsection (d) above, upon receipt of an undertaking by or on behalf of the Person to repay that amount, unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company as authorized in this section.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(f)     The indemnification provided by this Section 8.10 shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under the Company's Articles of Organization, or any agreement, vote of Members, or otherwise, both as to action in the Person's official capacity and as to action in another capacity while holding office, and shall continue as to a Person who has ceased to hold a position subject to indemnification under this section and shall inure to the benefit of the heirs, executors and administrators of such Person.

(g)     The Company may purchase and maintain insurance on behalf of any Person who may be entitled to indemnification pursuant to this section.

(h)     If the Company has paid indemnity or has advanced expenses to a Person under this section, the Company shall promptly report the indemnification or advance in writing to the Members.

(i)     For purposes of this section, references to **"other enterprises"** shall include employee benefit plans; references to **"fines"** shall include any excise taxes assessed on a Person with respect to an employee benefit plan; and references to **"serving at the request of the Company"** shall include any service as a Manager, officer, employee or agent of the Company that imposes duties on, or involves services by such Person with respect to an employee benefit plan, its participants or beneficiaries. A Person who acted in good faith and in a manner the Person reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner **"not opposed to the best interests of the Company"** as referred to in this Section.

8.11    Tax Matters Partner.  Barry Isaacson shall designated as the "Tax Matters Partner" of the Company, as defined in the Code, with all necessary authority to act on behalf of the Company (the **"TMP"**).  The TMP shall have the right to resign by giving thirty (30) days written notice to the Members (and the TMP shall be deemed to have resigned in the event of Resignation, disability, death, liquidation or termination, as such terms apply with respect to a Manager pursuant to Section 8.1(a)).  Upon the resignation of the TMP, a successor TMP shall be elected by the Super Majority Members.

8.12    Restrictive Covenants.

(a)     During such time that a Manager owns a Membership Interest and for one year from the date said Manager, ceases to own a Membership Interest in the Company, each such Manager shall not (i) solicit customers of the Company for a purpose that is Competitive (as defined below), or (ii) engage in any business which is Competitive with that of the Company, either directly or indirectly, in any capacity (whether as owner, partner, shareholder, broker, dealer, agent, employee, consultant or otherwise) within any state in which the Company's products or services are distributed or sold.  Selling, distributing, manufacturing or marketing of any product or service that the Company sells, provides, distributes, manufacturers or markets shall be deemed to be "Competitive".  The parties acknowledge that they have attempted to limit the Member's

22

FILED DATE: 1/21/2021 9:08 AM    2019L013339

right to compete only to the extent necessary to protect the Company from unfair competition.

(b)    Each Manager acknowledges that the covenants contained in this Section 8.13 are reasonable in time, geographical and temporal scope and in all other respects and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of the Company.  If any court of competent jurisdiction determines that any of such covenants, provisions, or portions of Section 8.13 or any part thereof, are unenforceable and invalid, then (i) the validity and enforceability of any remaining covenants, provisions or portions thereof shall not be affected by such determination, (ii) those of such covenants, provisions, or portions that are determined to be unenforceable because of the duration or scope thereof shall be severed and/or reformed by the court to reduce their duration or scope so as to render the same enforceable against such Member, and (iii) all remaining covenants, provisions, portions and terms of this Section 8.13 shall be valid and enforceable to the fullest extent permitted by requirements of law.

(c)    Each Manager hereby agrees that if such Manager violates or threatens to violate any of the provisions of this Section 8.13 it would be difficult to determine the entire cost, damage or injury which the Company would sustain and would result in irreparable damages.  Each Manager acknowledges that if it violates or threatens to violate any of the provisions of this Section 8.13, Company may have no adequate remedy at law.  In that event, Company shall have the right, in addition to any other rights that may be available to it, to seek to obtain without posting of bond in any court of competent jurisdiction injunctive relief to restrain any violation or threatened violation by any Manager of any provision of this Section 8.13 or to compel specific performance by any Manager of one or more of its obligations under this Section 8.13.  The seeking or obtaining by Company of such injunctive relief shall not foreclose or in any way limit the right of Company to obtain a money judgment against any Manager for any damage to Company that may result from any breach by Manager of any provision of Section 8.13  In the event of a breach by a Manager of any covenant set forth in this Section 8.13, the term of such covenant will be extended by the period of duration of such breach.

ARTICLE IX
Members

9.1    No Control by Interest Holders.  The Interest Holders in their capacity as such shall take no part in the control or management of the affairs of the Company, nor shall an Interest Holder have any authority to act for or on behalf of the Company or to sign for or bind the Company.  Except as otherwise provided herein, any matter permitting or requiring the vote or consent of the Members shall be determined by the Super Majority Members.

9.2    Limitation of Liability.  Except as expressly provided in this Agreement, by the Act or by other applicable law, no Interest Holder of the Company is liable for any debts, liabilities or obligations of the Company or the other Interest Holders, whether arising in tort, contract or otherwise, solely by reason of being an Interest Holder of the Company, beyond the amount of such Interest Holder's Capital Contribution.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

9.3   <u>Rights of Inspection</u>.  Any Member of record shall have the right to examine, at any reasonable time or times, during normal business hours, for all purpose and upon prior reasonable notice, the books and records of account, minutes and records of Members and to make copies thereof at such Member's expense.  Such inspection may be made by any agent or attorney of the Member.  Upon the written request of any Member, the Company shall mail or otherwise direct to such Member the Company's most recent financial statement, showing in reasonable detail its assets and liabilities and the results of its operations.

9.4   <u>No Exclusive Duty to Company</u>.  Subject to the restrictive covenants set forth in <u>Section 8.12</u>, any Member or any of their Affiliates are free to directly or indirectly own or acquire interests in other businesses and undertakings and to directly or indirectly pursue and engage in other investments, activities, employment and opportunities (**"Other Interests"**), and subject to the restrictive covenants set forth in <u>Section 8.12</u>: (i) no Member or any of their Affiliates will have any obligation to offer the Company or any other Member or their Affiliates any Other Interests or the right to participate therein (or to the income or proceeds derived therefrom); (ii) neither the Company nor any Member or their Affiliates will have any rights in any Other Interests (or to the income or proceeds derived therefrom) in which any other Member or their Affiliates engages outside of the Company by virtue of such Member's relationship to the Company; (iii) no Member or any of their Affiliates will be required to give notice of or otherwise disclose to the other Members or the Company the existence or nature of any such Other Interests; (iv) each Member and the Company hereby waives any conflict of interest related to such Other Interests; and (v) the Company and each Member agrees that it will have no claim under fiduciary duty or similar principles (including the legal principles of "corporate opportunity," "business opportunity" and similar principles) with respect to such Other Interests. Subject to the restrictive covenants set forth in <u>Section 8.12</u>, no Member or any of their Affiliates shall have any obligation to the Company or the other Members with respect to any Other Interest.  Except for a breach of the restrictive covenants set forth in <u>Section 8.12</u>, each of the Members and the Company hereby expressly waive, release and hold harmless the other Members and the other Members' Affiliates (and each other Member, and Affiliate of each other Member shall not be subject to any resulting liability, claim or action by or on behalf of the Company and/or any Member or its Affiliates, directors, officers, employees and shareholders) from any breach or violation of any fiduciary duty or obligation owed by such Member or Affiliate to the Company and/or any of the Members by reason of such Member or Affiliate taking actions or inactions which such Member or Affiliate subjectively believes may serve to further the Member's or Affiliate's Other Interests to the detriment of the Company and/or any other Member.

9.5   <u>Informal Actions of Members</u>.  If all of the Members shall meet at any time and place, either within or outside of the State of Illinois, and consent to the holding of a meeting at such time and place, the meeting shall be valid without call or notice, and at such meeting lawful action may be taken.  Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one (1) or more written consents describing the action taken, signed by each Member entitled to vote and delivered to the Company for inclusion in the minutes or for filing with the Company's records.  Action taken under this <u>Section 9.5</u> is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

24

FILED DATE: 1/21/2021 9:08 AM   2019L013339

## ARTICLE X
## FISCAL MATTERS

10.1   <u>Fiscal Year</u>.  The fiscal year of the Company for both accounting and income tax purposes shall begin on the first (1st) day of January and end on the last (31st) day of December each year, unless otherwise determined by an the Super Majority Members.

10.2   <u>Deposits and Withdrawals</u>.  All funds of the Company shall be deposited from time to time to the credit of the Company in such banks, trust companies or other depositories as the Company may select.

10.3   <u>Checks, Drafts, Etc</u>.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company shall be signed by a Manager or by such persons as the Company may designate from time to time.

10.4   <u>Contracts</u>.  Except as may be expressly restricted by this Agreement, the Company may enter into any contract or execute any instrument in the name of and on behalf of the Company.

10.5   <u>Expenses</u>.  The Company shall be responsible for all organizational expenses and all expenses as a going concern.

10.6   <u>Accountant</u>.  An accountant may be selected from time to time by the Company to perform such tax and accounting services as may, from time to time be required.  The accountant may be removed by the Company, with or without assigning any cause.  The Company shall pay such accounting fees.

10.7   <u>Legal Counsel</u>.  One (1) or more attorneys at law may be selected from time to time by the Company to review and/or deal with the legal affairs of the Company, to perform such other services as may be required or desired, and to report to the company with respect thereto.  The legal counsel may be removed by the company, with or without assigning any cause. The Company shall pay such legal fee.

## ARTICLE XI
## TRANSFERABILITY

11.1   <u>General Prohibition on Transfers</u>.

(a)   Except for a Transfer to a Permitted Transferee no Interest Holder shall Transfer any Units in the Company without the prior written consent of the Super Majority Members.  Upon the Insolvency, legal incompetency, death, dissolution or liquidation of an Interest Holder, or the occurrence of an Involuntary Transfer or other Transfer in violation of this Agreement with respect to any of an Interest Holder's Units, any assignee, transferee, successor or Legal Representative of such Interest Holder shall not be entitled to become or exercise any rights of a Member, but shall, to the extent of the Membership Interest acquired, be entitled only to the predecessor Member's economic rights, if any, in the capital, profits, losses and distributions of the Company and all rights, duties, liabilities and obligations in connection therewith.

25

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(b)    Notwithstanding anything contained in this Agreement to the contrary, in no event shall the Transfer of any Units be permitted if such Transfer would: (i) violate any law or governmental rule or regulation of any federal, state or local government applicable to such Transfer; (ii) cause any Interest Holder to be subject to personal liability under the laws of any applicable jurisdiction; (iii) cause the Company to be treated other than as a partnership for federal income tax purposes; (iv) result in the Company not qualifying for an exemption from the registration requirements of any applicable federal or state securities laws; (v) result in any violation of any applicable federal or state securities laws; (vi) result in a default under or the acceleration of any indebtedness of, or secured by assets of, the Company; (vii) result in the Company having to register as an investment company under the Investment Company Act of 1940, as amended; (viii) require the Company, any Manager or any Affiliate of either to register as an investment advisor under the Investment Advisers Act of 1940, as amended, or (ix) unless such Transfer has been approved by the Super Majority Members, breach or cause a default, or give rise to a right of termination on the part of the licensor, under any license agreement to which the Company or any of its Subsidiaries is a licensee.

11.2    <u>Transfers to Permitted Transferees</u>.  Any Member may, subject to the terms and conditions of Article XI, Transfer all or a portion of his/its Membership Interests to a Permitted Transferee without the consent of the Manager; provided, however, that any Member desiring to Transfer any Membership Interests to a Permitted Transferee shall give the Managers thirty (30) days prior written notice thereof.  Once the conditions of Transfer have been satisfied, a Permitted Transferee shall automatically be admitted to the Company as a Member.

11.3    <u>General Transfer Provisions</u>.  The following provisions shall apply to an Interest Holder's Transfer of Company Units:

(a)    In the case of a Transfer of any of an Interest Holder's Units permitted pursuant to this Agreement, such Transfer shall not be given effect unless and until: (i) the Transfer is made in writing, in form and substance acceptable to the Super Majority Members, signed by the Interest Holder and accepted in writing by the transferee, and a duplicate original of such document is delivered to the Company; and (ii) the transferee executes and delivers to the Company a written agreement, in form and substance acceptable to the Super Majority Members, pursuant to which said transferee agrees to be bound by and confirms the covenants, representations, warranties and power of attorney contained in this Agreement.  The foregoing to the contrary notwithstanding, the Company shall be entitled to treat any such prospective transferee as the absolute owner of the Units in all respects and shall incur no liability for distributions made in good faith to such transferee prior to such time as the documents specified in the preceding subsections (i) and (ii) have been delivered to and accepted by the Company.  The costs (including reasonable attorneys' fees) incurred by the Company in processing any Transfer of any of an Interest Holder's Units permitted pursuant to this Agreement shall be borne by the transferee, and shall be payable prior to and as a condition of such Transfer.

(b)    In the case of a Transfer of any of an Interest Holder's Units permitted pursuant to this Agreement, the transferee shall be subject to and bound by all terms,

FILED DATE: 1/21/2021 9:08 AM   2019L013339

conditions and obligations of this Agreement to which such Interest Holder was subject or bound, without regard to whether such transferee has executed a counterpart hereof or any other document contemplated hereby.

(c)     Unless admitted as a Member to the Company pursuant to the provisions of Section 12.1, the transferee of any of an Interest Holder's Units in the Company shall not be entitled to become, or exercise any rights of, a Member, but shall, to the extent of the Membership Interest or Economic Interest, as applicable, acquired, be entitled only to the predecessor Interest Holder's rights, if any, in the capital, profits, losses and distributions of the Company.  Any Person who acquires, in any manner whatsoever, any Membership Interest or Economic Interest, as applicable, of a Manager shall not be a Manager by reason thereof.

11.4     Effect of Dissociation Event.  Notwithstanding anything to the contrary in the Act, except as otherwise set forth herein, a Member who experiences a Dissociation Event (a "**Dissociated Member**"), whether or not such Dissociation Event was a result of a voluntary dissociation or involuntary dissociation, shall have no right to require, and the Company shall not be obligated to, repurchase such Member's Membership Interest.  The Membership Interests of any such Dissociated Member shall be deemed Economic Interests and such Dissociated Member shall be deemed an Assignee; provided, however, that notwithstanding anything herein to the contrary, so long as such Dissociated Member continues to have the right to receive distributions pursuant to this Agreement, such Dissociated Member shall continue to be bound by the terms of this Agreement.

11.5     Transfer Obligation of Permitted Transferee.   Unless otherwise agreed in writing by the Super Majority Members, upon the occurrence of any event which requires (or if the transferor is no longer a Member, would have required) such transferor to Transfer such transferor's Units, the Permitted Transferees of such transferor shall be obligated to Transfer all of their Units on the same terms and conditions as such transferor is required (or would have been required) to Transfer.

## ARTICLE XII
### Admission of Additional Members; Withdrawal and Expulsion of Members

12.1     Admission of Additional Members.  Subject to the provisions of Sections 6.3 and 6.4 above, the Super Majority Members, in their sole and absolute discretion, may admit one or more additional Members; provided, however, that before being admitted as a Member, such Person must execute a counterpart signature page to this Agreement.  Additional Members shall be entitled to all of the rights and privileges of the original Members hereunder and shall be subject to all of the obligations and restrictions hereunder, and in all other respects their admission shall be subject to all of the terms and provisions hereof.

12.2     Withdrawal of a Member.  Except as otherwise provided in this Agreement, no Member shall be entitled to withdraw from the Company without the prior consent of the Super Majority Members.  In no event shall any Member withdrawing from the Company be entitled to receive any money or property from the Company except: (a) by way of distributions pursuant to Sections 7.6, 7.7 or 7.8 or  upon the winding up of the Company pursuant to Article XIII; (b) in

FILED DATE: 1/21/2021 9:08 AM   2019L013339

respect of any bona fide loans to the Company then due and owing; and (c) as expressly provided elsewhere in this Agreement.

## ARTICLE XIII
## Winding Up

13.1    Liquidation Procedures.  Upon termination of the Company pursuant to Article V, the affairs of the Company shall be wound up and the Company shall be dissolved, unless the Super Majority Members elects to continue the Company in accordance with Section 5.2(a).  As part of the winding up of the Company, a proper accounting shall be made of the profit or loss of the Company from the date of the last previous accounting to the date of termination, and the Capital Account of each Interest Holder shall be appropriately adjusted.

13.2    Liquidating Trustee.  Upon the winding up of the Company business for any reason, a Person appointed by the Super Majority Members shall act as Liquidating Trustee or shall elect a Liquidating Trustee.   The Liquidating Trustee shall have full power to sell, assign and encumber Company assets.  All certificates or notices thereof required by law shall be filed on behalf of the Company by the Liquidating Trustee.

13.3    Distribution on Winding Up.  In the event of the winding up of the Company for any reason, the proceeds of liquidation shall be applied and distributed in the following order:

(a)    To the creditors of the Company, including Interest Holders who are creditors, in satisfaction of liabilities of the Company, other than liabilities for distributions under Sections 7.6, 7.7 or 7.8, all in the order of priority and to the extent provided by law.

(b)    To the Interest Holders, former Members and Assignees in satisfaction of liabilities of the Company for distributions due and owing.

(c)    To the Members and Assignees in accordance with Section 7.6 (after taking into account any distributions for the Fiscal Year during which the liquidation occurs).  Notwithstanding anything in this Agreement to the contrary, no Member or Assignee should have any obligation to restore a negative Adjusted Capital Account Balance upon liquidation or otherwise.

13.4    Liquidating Trust.  In the discretion of the Liquidating Trustee, a *pro rata* portion of the distributions that would otherwise be made to the Interest Holders pursuant to Section 13.3(c) may be distributed to a trust established for the benefit of the Interest Holders for the purposes of liquidating Company assets, collecting amounts owed to the Company and paying any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company.  The assets of any such trust shall be distributed to the Interest Holders from time to time in the reasonable discretion of the Liquidating Trustee, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Interest Holders pursuant to this Agreement.

28

FILED DATE: 1/21/2021 9:08 AM   2019L013339

13.5   Distributions In Kind.  In the event the Liquidating Trustee determines that it is necessary or desirable to make a distribution of Company property in kind, such property shall be transferred and conveyed to the distributees as tenants in common so as to vest in them undivided interests in the whole of such property in proportion to their respective rights to share in the proceeds of the sale of such property in accordance with the provisions of Section 13.3. Any property that is distributed in kind shall be deemed to have been sold immediately prior to the date of liquidation for its then fair market value and the gain or loss resulting therefrom shall be allocated to the Capital Accounts in the manner set forth in Article VII hereof.   Upon liquidation, prior to making any liquidating distributions hereunder, the Liquidation Trustee is hereby authorized and directed to make any and all special allocations of Net Profits, Net Losses, and items of Company income, gain, deduction and credit in a manner which results in the respective Capital Accounts having balances equal to (or as close thereto as possible) the aggregate liquidating distribution that each such Member or Assignee shall receive hereunder.

13.6   Partition.  Each Member and Assignee irrevocably waives any right that such Person may have to (a) maintain any action for partition with respect to any of the assets of the Company, (b) seek a foreclosure of such Person's Units or (c) otherwise obtain a distribution of Company assets which constitutes a return of any part of such Person's Capital Contribution to the Company prior to the occurrence of a Dissolution Event.  Upon any breach of the provisions of this section by any Member or Assignee, the other Members, in addition to all of the rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding.

13.7   Definitions.  For purposes of this Article XIII, the liquidation of the Company shall be considered as occurring upon the earlier to occur of (i) the date upon which the Company is terminated under Code Section 708(b)(1)(A), or (ii) the date upon which the Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts and distributing any remaining balance to the Interest Holders).

## ARTICLE XIV
### Power of Attorney; Amendments

14.1   Power of Attorney.  Each Interest Holder hereby agrees that, upon the execution of this Agreement, such Interest Holder shall and hereby does consent and appoint the Managers as its true and lawful attorney, coupled with an interest in its name, place and stead to sign, execute, acknowledge, swear to and file any and all documents which in the discretion of such attorney are required to be signed, executed, acknowledged, sworn to or filed by the Interest Holder to discharge the purposes of the Company.  Without limitation, among the documents which the Managers may execute on behalf of each Interest Holder shall be the following:

(a)   Any amendments to this Agreement pursuant to Section 14.3.

(b)   The Articles of Organization required of the Company by the Act and any other instrument which may be required of the Company or an Interest Holder pursuant to the Act or the laws of any other jurisdiction.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(c)     Any amendments to the Articles of Organization of the Company made pursuant to Section 2.2 or which are described in Section 18-202(b) of the Act.

14.2    Grant of Authority.   The grant of authority set forth in Section 14.1: (a) is a special power of attorney coupled with an interest, is irrevocable and shall survive the death, legal incapacity, liquidation or dissolution of an Interest Holder; (b) may be exercised by the Managers for an Interest Holder by a facsimile signature or by listing the names of all of the Interest Holders executing any instrument with the signature of the Managers, as attorney in fact for all of them; and (c) shall survive the Transfer by an Interest Holder of all or any portion of its Units, except that where the transferee has been approved by the Manager for admission to the Company as a Member, the power of attorney shall survive such Transfer for the sole purpose of enabling the Managers to execute, acknowledge and file any instrument necessary to effect such admission, and the grant of authority set forth in Section 14.1 shall be deemed to have been made by such transferee.

14.3    Amendments.   This Agreement may only be altered, amended, restated, or repealed and a new Agreement by unanimous written consent of all of the Members.

ARTICLE XV
Securities Laws Representations

15.1    Securities Laws Representations.

(a)     No registration statement relating to Membership Interests or the Economic Interests in the Company (Units or otherwise) has been or shall be filed with the United States Securities and Exchange Commission under the Federal Securities Act of 1933, as amended, or the securities laws of any state.

(b)     Each Interest Holder represents and warrants to the Managers, the other Members and to the Company that:

(a)     Such Interest Holder has the power and authority to execute and comply with the terms and provisions hereof.

(b)     Such Interest Holder's Units in the Company have been or will be acquired solely by and for the account of such Interest Holder for investment purposes only and are not being purchased for subdivision, fractionalization, resale or distribution; such Interest Holder has no contract, undertaking, agreement or arrangement with any person to sell, transfer or pledge to such person or anyone else such Interest Holder's Units (or any portion thereof); and such Interest Holder has no present plans or intentions to enter into any such contract, undertaking or arrangement.

(c)     Such Interest Holder's Units in the Company have not and will not be registered under the Federal Securities Act of 1933, as amended, or the securities laws of any state, and cannot be sold or transferred without compliance with the registration provisions of said Securities Act of 1933, as amended, and the applicable state securities laws, or compliance with exemptions, if any, available thereunder.  Such Interest Holder understands that neither the Company nor the Managers has any obligation or intention to

30

FILED DATE: 1/21/2021 9:08 AM   2019L013339

register the Units under any federal or state securities act or law, or to file the reports to make public the information required by Rule 144 under the Securities Act of 1933, as amended.

(d)     Such Interest Holder expressly represents that (A) it has such knowledge and experience in financial and business matters in general, and in investments of the type to be made by the Company in particular; (B) it is capable of evaluating the merits and risks of an investment in the Company; (C) its financial condition is such that it has no need for liquidity with respect to its investment in the Company to satisfy any existing or contemplated undertaking or indebtedness; (D) it is able to bear the economic risk of its investment in the Company for an indefinite period of time, including the risk of losing all of such investment, and loss of such investment would not materially adversely affect it; and (E) it has either secured independent tax advice with respect to the investment in the Company, upon which it is solely relying, or it is sufficiently familiar with the income taxation of partnerships that it has deemed such independent advice unnecessary.

(e)     Such Interest Holder acknowledges that the Manager has made all documents pertaining to the transaction available and has allowed it an opportunity to ask questions and receive answers thereto and to verify and clarify any information contained in the documents.

(f)     Such Interest Holder has relied solely upon the documents submitted to it and independent investigations made by it in making the decision to purchase its Units in the Company.

(g)     Such Interest Holder expressly acknowledges that (A) no federal or state agency has reviewed or passed upon the adequacy or accuracy of the information set forth in the documents submitted to such Interest Holder or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of an investment in the Company; (B) there are restrictions on the transferability of such Interest Holder's Units in the Company; (C) there will be no public market for the interest, and, accordingly, it may not be possible for such Interest Holder to liquidate its investment in the Company; and (D) any anticipated federal or state income tax benefits applicable to such Interest Holder's interest may be lost through changes in, or adverse interpretations of, existing laws and regulations, or as a result of an intentional change in the Company's federal or state income tax status.

(h)     If an individual, that he or she is a resident whose *bona fide* place of residence is as set forth opposite such Interest Holder's name on Exhibit A hereto; if a corporation, partnership or limited liability company, that its *bona fide* principal place of business is as set forth opposite such Interest Holder's name on Exhibit A hereto, and it was not formed for the purpose of making an investment in the Company. If the Interest Holder is a trust, the aforesaid representations shall be deemed made by the trustee.

31

FILED DATE: 1/21/2021 9:08 AM   2019L013339

## ARTICLE XVI
## General Provisions

16.1   <u>Waiver of Conflict of Interest</u>.   The law firm of Latimer LeVay Fyock LLC represents the Company and certain of the Okun Trust and Michael Okun.   Latimer LeVay Fyock LLC has disclosed to the parties its potential conflicts of interest arising from the negotiation of this Agreement and all documents related thereto and arising from the organization and operation of the Company.   Latimer LeVay Fyock LLC represents the Company with regard to such matters, the organization of the Company and the operations of the Company and Latimer LeVay Fyock LLC has advised the Members to seek independent representation.   The Members and the Company acknowledge that they have been advised of all conflicts of interest arising from the representation provided to the parties referenced herein by attorneys from the law firm of Latimer LeVay Fyock LLC.   The parties hereby waive any conflict of interest resulting from the past, current and future representation provided by Latimer LeVay Fyock LLC to the Members and the Company in both matters related and unrelated to this Agreement.

16.2   <u>Notices</u>.   All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given and received (a) when personally delivered, sent by facsimile with a confirmation of transmission, or sent by email with confirmation of transmission, (b) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery or (c) three (3) business days following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested, to the following addresses:

     (a)    If to the Company:

          The address of the Company's principal office on record with the Office of the Secretary of State.

          Attn: Manager

     (b)    If to an Interest Holder:

          The latest address for such Interest Holder in the books and records of the Company.

or to such other address as any party hereto may request by notice given to the other parties hereto in accordance with this section.

16.3   <u>Successors</u>.   This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of all Interest Holders and their legal representatives, heirs, successors and assigns, and any other Person who shall have acquired any of the Units of any Interest Holder in accordance with this Agreement.

16.4   <u>Governing Law</u>.   **This Agreement shall be construed in conformity with the laws of the jurisdiction under which the Company is presently organized, without regard to conflict of law provisions.**   The Company and each Interest Holder agree that any dispute

FILED DATE: 1/21/2021 9:08 AM    2019L013339

among or between them concerning the Company or this Agreement shall be litigated either in the United States District Court for the Northern District of Illinois or in the Circuit Court of Cook County, Illinois. In any such proceeding, the Company and each Interest Holder shall be deemed to have waived its right to a trial by jury. The prevailing parties in any litigation in connection with this Agreement shall be entitled to recover from the non-prevailing parties all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the prevailing parties in connection with any such litigation.

16.5    Legal Fees and Expenses. If any party hereto is in breach of any representation or warranty or defaults in the performance of any of its or his covenants, agreements or obligations described in this Agreement, then in addition to any and all other rights or remedies which the non-defaulting party may have against the defaulting party, the defaulting party shall be liable to and shall pay to the non-defaulting party a sum equal to the non-defaulting party's court costs and reasonable attorneys' fees and expenses incurred in enforcing the covenants, agreements or obligations of the defaulting party described in this Agreement.

16.6    Waiver of Notice. Whenever any notice is required to be given pursuant to the provision of the Act, the Articles of Organization or this Agreement, a waiver thereof, in writing, signed by the persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. No waiver of any notice, right or claim shall be valid unless in writing and signed by the party waiving same.

16.7    Pronouns and Headings. As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction. The headings, titles and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

16.8    Interest Holders Not Agents. Nothing contained herein shall be construed to constitute any Interest Holder the agent of another Interest Holder, except as specifically provided herein, or in any manner to limit the Interest Holders in the carrying on of their own respective businesses or activities.

16.9    Rights of Creditors or Third Parties Under the Agreement. This Agreement is entered into among the Managers and Interest Holders for the exclusive benefit of the Company and its Managers and Interest Holders, and is expressly not intended for the benefit of any other Person, including any Assignee or any creditor of the Company, its Managers or Interest Holders. Except and only to the extent provided by applicable law, no such Assignee, creditor or other third party shall have any rights under this Agreement or any agreement between the Company and any Manager or Interest Holder with respect to any Capital Contributions, distributional interest (within the meaning of the Act), or otherwise.

16.10    Entire Understanding. This Agreement and the Contribution Agreement constitute the entire understanding among the Interest Holders and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.

16.11    Severability. If any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable

FILED DATE: 1/21/2021 9:08 AM   2019L013339

in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect (a) any other provision or part of a provision of this Agreement nor (b) this Agreement's validity, legality and enforceability in any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

16.12   Further Assurances.   Each of the Interest Holders shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

16.13   Counterparts and Electronic Signature.   This Operating Agreement may be executed in multiple counterparts, and by facsimile or electronic signature each of which shall be deemed an original but all of which shall constitute one and the same instrument.

*[Remainder of page intentionally left blank; signatures page follows.]*

FILED DATE: 1/21/2021 9:08 AM   2019L013339

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement as of October 13, 2016.

COMPANY:

THE PREMIER PROPERTY TEAM LLC ,
an Illinois limited liability company

By: _____
    Barry Isaacson, Member


By:  Michael D. Okun Revocable Trust u/a/d December 27,
     2012 as amended

    By: _____
        Michael D. Okun, Trustee

MEMBERS:

_____
Barry Isaacson


Michael D. Okun Revocable Trust u/a/d December 27,
2012 as amended

By: _____
    Michael D. Okun, Trustee


MANAGERS:

_____
Barry Isaacson

FILED DATE: 1/21/2021 9:08 AM   2019L013339

## EXHIBIT A

| Members: | Common Units | Percentage Interest | Capital Contribution |
|---|---|---|---|
| Barry Isaacson | 67,000 | 67% | $   0 |
| Michael D Okun Revocable Trust u/a/d December 27, 2012 as amended | 33,000 | 33% | $  225,000 |
| **TOTAL:** | 100,000 | 100% | $225,000 |

FILED DATE: 1/21/2021 9:08 AM   2019L013339

## CAPITAL CONTRIBUTION AGREEMENT

This Capital Contribution Agreement (this **"Agreement"**) is made and entered into as of the *13* day of October, 2016, by and among Michael D. Okun Revocable Trust dated December 27, 2012 (**"Okun"**), The Premier Team, LLC, an Illinois limited liability (the **"Company"**) and Barry Isaacson ("Isaacson"). Okun, the Company and Isaacson are sometimes referred to herein as the **"Parties"**.

## RECITALS

WHEREAS, the Company has conducted and operated construction company (the "Business").

WHEREAS, Isaacson owns one hundred percent (100%) of the Membership Interests of the Company, representing all of the outstanding equity interests in the Company.

WHEREAS, Okun desires to make certain capital contributions to the Company, as more fully described in that certain Amended and Restated Operating Agreement of the Company of even date herewith, to be entered into by the Parties concurrently herewith (the **"Operating Agreement"**) and the Company desires to issue to Okun Membership Interests representing thirty three (33%) of the outstanding equity interests in the Company, all on the terms and subject to the conditions contained in this Agreement and the Operating Agreement.

WHEREAS, capitalized terms and otherwise defined in this Agreement shall have the meaning ascribed to such terms in the Operating Agreement.

## CLAUSES

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the forgoing Recitals which are fully incorporated into this Agreement, and on the basis of the respective representations and warranties herein set forth and the covenants, agreements and indemnities herein contained, the Parties hereto agree as follows:

1. <u>DEFINITIONS</u>. Capitalized terms not otherwise defined herein shall have the meanings set forth in <u>Exhibit A</u>, attached hereto and made a part hereof.

2. <u>Capital Contribution</u>. Subject to the terms of the Operating Agreement, Okun will make a Capital Contribution to the Company in the amount of 225,000 (as set forth in Exhibit A) of the Operating Agreement (**"Okun Capital Contribution"**).

3. <u>Issuance of Membership Interests/Membership Units</u>. In consideration for the Okun Capital Contribution the Company hereby issues to Okun a thirty three percent (33%) Percentage Interest in the Company and Membership Interests and Membership Units, representing thirty three percent (33%) of the outstanding equity interests in the Company (collectively, the **"Okun Interests"**), free and clear of all liens, mortgages, claims, encumbrances or restrictions of any kind, other than those set forth in the Operating Agreement.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

4.   REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND ISAACSON. In order to induce Okun to make and commit to the Okun Capital Contribution and enter into the Operating Agreement, Company and Isaacson represent, warrant, jointly and severally, and agree that the following are true and correct on the date hereof and as of the Closing Date:

(a)   Organization, Good Standing, Authority.

(i)   The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Illinois, has power and authority to carry on its business as it is now being conducted and to own the properties and assets it now owns in the State of Illinois. The Company has no subsidiaries, nor does its own or hold any equity rights in any other Person

(ii)   This Agreement has been duly authorized, executed and delivered on behalf of Company and Isaacson, and assuming due authorization, execution and delivery by Okun, constitutes the legal, valid and binding agreement of the Company and Isaacson enforceable against the Company and Isaacson, in accordance with its terms, except as such enforcement may be limited by: (A) any applicable bankruptcy, insolvency, reorganization, receivership, moratorium, fraudulent transfer and conveyance Laws and other similar Laws of general application relating to or affecting the rights and remedies of creditors; or (B) general principles of equity, whether considered in a proceeding at law or equity.

(iii)   The execution and delivery of the Agreement does not, and the consummation of the transactions contemplated hereby will not, result in violation of, require the consent or approval of any third party under, conflict with, or result in any acceleration or default or any similar adverse effect under: (A) any term or provision of the Articles of Organization or operating agreement of the Company or Isaacson; or (B) any provision of any instrument to which any of Company or Isaacson is a party or by which the Company or Isaacson or any of Company or Isaacson's properties or assets are bound.

(b)   Capitalization.   Isaacson holds of record and owns beneficially **one hundred percent (100%)** of the issued and outstanding Membership Interests and Membership Units of the Company free and clear of all liens and encumbrances. All of the Company's Membership Interests and Membership Units have been duly authorized and validly issued, are fully paid and nonassessable, were issued in accordance with the registration or qualification provisions of relevant Laws, or pursuant to valid exemptions therefrom, and free of preemptive rights. There are no outstanding subscriptions, options, calls, contracts, commitments, understandings, restrictions, arrangements, rights or warrants, including any right of conversion or exchange under any outstanding security, debenture, instrument or other agreement obligating the Company or Isaacson to issue, deliver or sell, or cause to be issued, delivered or sold, additional equity interests of the Company or obligating the Company or a Isaacson to grant, extend or enter into any such agreement or commitment. There are no voting trusts, proxies or other agreements or understandings to which the Company or Isaacson is a party or are bound with respect to

- 2 -

FILED DATE: 1/21/2021 9:08 AM    2019L013339

the voting of the Company's Membership Interests or Membership Units. There are no outstanding or authorized equity appreciation, phantom equity or similar rights with respect to the Company

(c)    <u>Closing Balance Sheet</u>. Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Company's balance sheet as of the Closing Date (the "**Closing Balance Sheet**")

(d)    <u>Financial Statements</u>. Attached hereto as <u>Exhibit A</u>, are complete copies of the Company's financial statements for the current fiscal year through the Closing Date (including the Closing Balance Sheet) and the fiscal year ended December 31, 2015, including balance sheets and operating statements of income and cash flows for such periods (the "**Financial Statements**"). The Financial Statements (i) accurately and completely reflect in all material respects the financial condition, results of operations and related costs and expenses of the Company as of the dates and for the periods then ended and (ii) are complete and correct in all material respects.

(e)    <u>Undisclosed Liabilities</u>. Except as set forth in the Closing Balance Sheet, the Company has as of the date of the Closing Balance Sheet no liabilities or obligations of any nature or kind, whether accrued, absolute, contingent or otherwise related to the Business or the Company.

(f)    <u>Operation of Business</u>. Since January 1, 2016, (a) the Company has conducted the Business consistent with existing and historical operating procedures and practices; and (b) there has not been any (i) material damage, destruction, loss, condemnation or changes in the condition (financial or otherwise), whether or not covered by insurance, of the assets, liabilities or personnel of the Business or any change in the relationship of the Company with its employees, suppliers, customers or others, other than changes in the usual, regular and ordinary course of business; or (ii) event, circumstance or condition that has had, or is reasonably likely to have, a material, adverse effect on the financial condition, business, cash flows, assets, liabilities, prospects or properties the Business.

(g)    <u>Title; Prior Commitments or Liens; Condition of Assets</u>. The Company owns and has good and marketable title to the Company's assets, free and clear of all liens, encumbrances and claims of any kind. The Company's assets set forth on the Closing Balance Sheet comprise all tangible and intangible rights and assets necessary for the continued operation of the Business as it is currently being operated by the Company. All of the Company's assets are owned by the Company and the Company is not leasing or holding on consignment any equipment, furniture, fixtures or personal property. The Company has not received any notice of any violation of any law or permit matters relating to the Company's assets or their use.

(h)    <u>Tax Matters</u>. The Company has filed or shall timely file all tax returns and reports required by Law to be filed prior to the date of this Agreement and all Taxes, and any related penalties and interest required to be paid have been or shall be paid. All tax returns required to be filed by the Company covering periods prior to and including

FILED DATE: 1/21/2021 9:08 AM   2019L013339

the Closing Date shall be timely filed on a basis consistent with previous years as such become due and all Taxes due in connection therewith shall be timely paid. All tax returns accurately reflect the results of operations of the Business for periods indicated. The Company and Isaacson has no reason to believe that deficiencies may be asserted for the current year or any prior taxable year.

(i)    Employees. No employee of the Company is represented by any union and all of the Company's employees are non-union employees.

(j)    Compliance with Laws. The Company has complied with all Laws applicable to the Business. Neither the Company nor Isaacson has had notice or knowledge of any violation of any Law applicable to the Business. The Company has never been the subject of an Occupational and Safety Health Administration (or similar agency) inspection or been found by any agency to be in violation of any occupational safety or health Law.

(k)    Permits. The Company currently has all necessary Permits for the operation of the Business as currently conducted, or similar municipal, state or federal licenses.

(l)    Litigation. There is no claim, action, suit, proceeding, dispute or investigation pending or, to the best of the Company's or Isaacson's knowledge, threatened before any court, any arbitrator of any nature, or any Governmental Authority, department, commission, board, agency or instrumentality, brought by or against the Company, Isaacson, its Affiliates, officers, directors or employees, involving, affecting or relating to any of, the Business, the Company, or the transactions contemplated by this Agreement. Neither the Company nor Isaacson has knowledge of any basis for any such claim, action, suit, proceeding, dispute or investigation. No claim, action, suit, proceeding, dispute or investigation has resulted in any order, injunction or decree against the Company or the Business.

(m)    Payables. All of the Company's accounts payable set forth on the Closing Balance Sheet arose in the ordinary course of business consistent with past practice..

(n)    Due Diligence Materials. The Company has provided to Okun or its representatives all documents of the character and type described in the various due diligence requests delivered from time to time to the Company and there are no documents in the possession of the Company or Isaacson or any of its agents or representatives of a character or a type described in such request which would have not been so provided to Okun. There are no documents or information regarding the Company and the Business which may be material to Okun and which have not been disclosed to Okun, regardless of whether or not such information was requested by Okun. No representation or warranty or other statement by the Company or Isaacson in this Agreement, the Schedules hereto or any certificate or instrument delivered pursuant to this Agreement contains any untrue statement of a material fact, or to the knowledge of the Company, omits to state a material fact necessary in order to make any such statement

FILED DATE: 1/21/2021 9:08 AM   2019L013339

contained herein or therein not misleading in light of the circumstances in which it was made.

5.   <u>COVENANTS</u>.

   (a)   <u>Tax Allocations</u>.   Income (or loss) of the Company for the tax period commencing January 1, 2016 through the Closing Date (the "Short Period") shall be specifically allocated to Isaacson. The Short Period tax returns and all income and loss allocations for the Short Period shall be computed by the Company's accountants consistent with past practices.

   (b)   <u>Use of Proceeds</u>.   In accordance with the directions of the Company's Super Majority Members or Managers, in accordance with the Operating Agreement, the Company will use the proceeds from the Okun Capital Contribution for company working capital purposes; <u>provided that</u> an amount not to exceed $75,000 may be used to purchase the equity interests of the Grossmans in the Company.

   (c)   <u>Company Services on Behalf of Okun</u>.   For so long as Okun owns Membership Interests in the Company, the Company, at Michael Okun's request from time to time, shall provide construction services on behalf of Michael Okun, at no greater than Company cost.

6.   <u>CLOSING DELIVERIES</u>.

   (a)   <u>Closing Date</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place on such date that the Parties fully execute this Agreement and the Operating Agreement or such other date agreed to by the Parties (the "**Closing Date**"). The Closing shall be effective as of 12:01 a.m. on the Closing Date.

   (b)   <u>Deliveries by the Company and Isaacson</u>. At the Closing, in addition to any other documents or agreements required under this Agreement, the Company and Isaacson shall deliver to Okun the following (in each case duly signed if the item is a document):

      (i)   The Operating Agreement, duly executed by the Company and Isaacson;

      (ii)   A release from the Grossman's releasing any and all claims of Membership Interest or other rights to payments from the Company the a form acceptable to Okun; and

      (iii)   Such further certificates, instruments and other documents as shall be required to consummate the transaction contemplated hereby in conformity with this Agreement.

   (c)   <u>Deliveries by Okun</u>. At the Closing, in addition to any other documents or agreements required under this Agreement, Okun shall deliver to the Company the following (in each case duly signed if the item is a document):

FILED DATE: 1/21/2021 9:08 AM    2019L013339

(i)    The Operating Agreement, duly executed by Okun;

(ii)    The Okun Capital Contribution; and

(iii)    Such further certificates, instruments and other documents as shall be required to consummate the transaction contemplated hereby in conformity with this Agreement.

7.    SURVIVAL OF REPRESENTATION AND WARRANTIES: INDEMNITY.

(a)    Survival of Representation and Warranties.    The respective representations, warranties, covenants and indemnification obligations given in this Agreement shall survive the Closing Date.

(b)    Indemnity of Okun.  The Company and Isaacson shall indemnify, defend and hold harmless Okun and Michael Okun and their affiliates, beneficiaries, trustees, heirs, representatives, successors and assigns (the "Okun Indemnified Parties") from and against any and all liabilities, losses, claims, damages including consequential damages, suits, actions, judgments, obligations, penalties, costs and expenses, including reasonable attorney's fees and expenses and reasonable costs of investigation and litigation (collectively, "Losses") incurred by Okun Indemnified Parties as a result of or arising out of (a) any inaccuracy or breach of any of the representations, warranties or covenants made by the Company and Isaacson in this Agreement, the Operating Agreement or any document or agreement delivered in connection with this Agreement; (b) any obligation or liability as of the Closing Date not set forth on the Closing Balance Sheet; (c) any unpaid Taxes of the Company, or the Business; or (d) any non-compliance with or violation of Laws by the Company.

(c)    Right to Set-Off.  Without limitation, Okun and the Company shall have the right to set-off any Losses against any and all distributions which may otherwise be payable to Isaacson pursuant to the Operating Agreement.

8.    MISCELLANEOUS.

(a)    Assignment.  The rights, duties and privileges of the parties shall not be transferred or assigned in whole or in part without the prior written consent of the other party.

(b)    Entire Agreement.  This Agreement and the Operating Agreement, including the and Exhibits referred to herein and to be delivered pursuant to this Agreement, sets forth the entire agreement among the parties and merges and supersedes all prior discussions and agreements among them with respect to the subject matter hereof.  Neither party shall be bound by any condition, definition, warranty or representation with respect to any term or condition other than those provided for in this Agreement or the documents and Exhibits referred to herein or delivered pursuant to this Agreement or as amended by subsequent agreement in writing signed by the parties or a duly authorized officer or representative of the parties to this Agreement.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(c) <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and permitted assigns.

(d) <u>Notices</u>. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given and received (a) when personally delivered, sent by facsimile with a confirmation of transmission, or sent by email with confirmation of transmission, (b) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery or (c) three (3) business days following mailing from within the United States by first class United States mail, postage prepaid, certified mail return receipt requested, to the following addresses:

    (i)    If to the Company:

        The address of the Company's principal office on record with the Office of the Secretary of State.

        Attn: Manager

    (ii)    If to Okun or Isaacson::

        The latest address for such Person in the books and records of the Company.

or to such other address as any party hereto may request by notice given to the other parties hereto in accordance with this section.

(e) <u>Invalid Provision</u>. In the event that any provision of this Agreement is held to be invalid or illegal for any reason, such determination shall not affect the remaining provisions which shall be construed and enforced as if such illegal or invalid provision had never been included.

(f) <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

(g) <u>Pronouns</u>. The singular form denotes the plural and the masculine form denotes the feminine or neuter wherever appropriate.

(h) <u>Descriptive Headings</u>. All section headings, titles and subtitles contained herein are inserted for convenience and reference only and are to be ignored in any construction of the provisions hereof.

(i) <u>Legal Action</u>. In any action at law or in equity arising out of this Agreement and the transactions contemplated hereunder, the prevailing party shall be entitled to reasonable attorney's fees and court costs in addition to any other relief to which it may be entitled.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(j)     <u>Waiver</u>.  Any party may waive any term, condition or requirement under this Agreement or the Exhibits hereto which is intended for its own benefit, and any waiver of any term or condition of this Agreement or the Exhibits hereto shall not operate as a waiver of any other breach of such term or condition, nor shall any failure to enforce any provision hereof or of the Exhibits hereto operate as a waiver of such provision or of any other provision hereof or the Exhibits hereto.

(k)     <u>Further Assurances</u>.  Each party agrees to perform any further acts and execute and deliver any further documents which may be reasonably necessary to carry out the provisions of this Agreement.

(l)     <u>Disputes</u>.  Except for matters for which injunctive relief is appropriate, in the event of any dispute regarding the terms of this Agreement, the matter shall be submitted in writing to binding arbitration in Chicago, Illinois, in accordance with the rules of the American Arbitration Association or such other arbitrator as may be mutually agreed upon by the parties to the dispute.  All parties shall be provided a copy of any such request for arbitration.  The prevailing party shall recover reasonable attorneys' fees and cost of arbitration in the award rendered by the arbitrator.  The decision of the arbitrator shall be final and binding and not subject to judicial review, but may be submitted to any court of competent jurisdiction for enforcement in accordance with its terms.

(m)     <u>Counterparts, Facsimile and E-mail Transmission</u>.  This Agreement may be signed in any number of counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.  The Parties may sign and deliver this Agreement by facsimile transmission, or by e-mail with attached scanned signature page image.  Each of the Parties agree that they shall have the same force and effect as delivery of original signatures and that each of the Parties may use such signatures as evidence of the execution and delivery of this Agreement by all Parties to the same extent that an original signature could be used.

(n)     <u>Incorporation</u>.  The recitals contained herein, and the Schedules and Exhibits attached hereto are hereby incorporated and made a part of the terms and mutual covenants and agreements contained in this Agreement.

*[Remainder   of   page   intentionally   left   blank;   signatures   page   follows]*

FILED DATE: 1/21/2021 9:08 AM   2019L013339

The parties have executed this Agreement as of the date first above written.

**COMPANY:**

THE PREMIER PROPERTY TEAM, LLC, ,
an Illinois limited liability company

By: _____
Barry Isaacson, Member

**ISAACSON:**

_____
Barry Isaacson

**OKUN:**

MICHAEL  D.  OKUN  REVOCABLE  TRUST  U/A/D
DECEMBER 27, 2012 AS AMENDED

By: _____
Michael D. Okun, Trustee

- 9 -

FILED DATE: 1/21/2021 9:08 AM   2019L013339

## EXHIBIT A

## DEFINITIONS

"Closing" means the consummation of capital contribution transaction contemplated by this Agreement.

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including the Pension Benefit Guaranty Corporation and other quasi-governmental entities established to perform such functions.

"Law" means any law, statute, regulation, ordinance, rule, order, decree, judgment, consent or decree, enacted, promulgated, entered into, agreed or imposed by any Governmental Authority.

"Membership Interests" shall have the meaning set forth in the Operating Agreement.

"Membership Units" shall have the meaning set forth in the Operating Agreement.

"Operating Agreement" means that certain Amended and Restated Operating Agreement of the Company of even date herewith, to be entered into by the Parties concurrently herewith.

"Percentage Interest" shall have the meaning set forth in the Operating Agreement.

"Permits" means all federal, state and local licenses, certificates, permits, approvals and authorizations and similar rights issued by a Governmental Authority, including, but not limited to all applicable state and local liquor and health licenses.

"Person" means any individual, corporation, limited liability company, proprietorship, firm, partnership, limited partnership, trust, association or other entity.

"Taxes" means all taxes, charges, fees, duties, levies or other assessments, including income, gross receipts, net proceeds, ad valorem, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, windfall profits, employee's income withholding, unemployment and Social Security taxes and other withholding taxes, which are imposed by any Governmental Authority, and such term shall include any interest, penalties or additions to tax attributable thereto.

**EXHIBIT A**

**CLOSING BALANCE SHEET AND FINANCIAL STATEMENTS**

FILED DATE: 1/21/2021 9:08 AM    2019L013339

FILED DATE: 1/21/2021 9:08 AM    2019L013339

# General Liability Release of Claims

We, Gary Grossman & Sheryl Grossman, of 2566 Lincoln Ave, Long Grove, Illinois 60047, for and in consideration of the payment to us of $75,000.00, the receipt and sufficiency of which is hereby acknowledged, do hereby release and forever discharge The Premier Property Team, LLC & Premier Mosquito Control, LLC, of 453 South Vermont, Unit F, Palatine, Illinois 60067, their agents, employees, successors and assigns, and their respective heirs, personal representatives, affiliates, successors and assigns, and any and all persons, firms or corporations liable or who might be claimed to be liable, whether or not herein named, from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever, whether known or unknown, fixed or contingent, which I now have or may hereafter have or claim to have, as a result of or in any way relating to the following:

Releasing all claims of membership interest, equity, or loans payable in The Premier Property Team, LLC and Premier Mosquito Control, LLC.

It is understood and agreed that this payment is made and received in full and complete settlement and satisfaction of the aforesaid actions, causes of action, claims and demands; that this Release contains the entire agreement between the parties; and that the terms of this Agreement are contractual and not merely a recital. Furthermore, this Release shall be binding upon the undersigned, and his respective heirs, executors, administrators, personal representatives, successors and assigns. This Release shall be subject to and governed by the laws of the State of Illinois.

This Release has been read and fully understood by the undersigned and has been explained to me.

EXECUTED this 13 day of October , 20 16.

Signed: _____    _____

Gary Grossman                              Sheryl Grossman

FILED DATE: 1/21/2021 9:08 AM    2019L013339



FILED DATE: 1/21/2021 9:08 AM  2019L013339

# EXHIBIT B

# Exhibit B

FILED DATE: 1/21/2021 9:08 AM    2019L013339

## CAPITAL CONTRIBUTION AND MEMBER LOAN AGREEMENT AND AMENDMENT TO OPERATING AGREEMENT

This Capital Contribution and Member Loan Agreement and Amendment to Operating Agreement (this "**Agreement**") is made and entered into as of the 12th day of June, 2017, by and among Michael D. Okun Revocable Trust dated December 27, 2012 ("**Okun**"), The Premier Property Team, LLC, an Illinois limited liability (the "**Company**") and Barry Isaacson ("Isaacson").  Okun, the Company and Isaacson are sometimes referred to herein as the "**Parties**".

## RECITALS

WHEREAS, the Company has conducted and operated construction company (the "Business").

WHEREAS, Isaacson owns 67,000 Units of the Company representing sixty seven percent (67%) of the equity interests of the Company.

WHEREAS, Okun owns 33,000 Units of the Company representing thirty three percent (33%) of the equity interests of the Company.

WHEREAS, Okun and Isaacson entered into that certain Amended and Restated Operating Agreement of the Company dated October 13, 2016 (the "**Operating Agreement**").

WHEREAS, Okun desires to make provide the Company with a $200,000 line of credit as more fully described in that certain Secured Promissory Note and Agreement to be entered into by the Company and Okun Parties concurrently herewith (the "**Secured Note and Agreement**") and the Company desires to issue to Okun 34,000 Units of the Company such that Okun will thereafter own an aggregate number of Units representing 50% of the equity interests in the Company, all on the terms and subject to the conditions contained in this Agreement and the Operating Agreement.

## CLAUSES

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the forgoing Recitals which are fully incorporated into this Agreement, and on the basis of the respective representations and warranties herein set forth and the covenants, agreements and indemnities herein contained, the Parties hereto agree as follows:

1. **DEFINITIONS**.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Company's Operating Agreement.

2. Capital Contribution. Okun will make a Capital Contribution to the Company in the amount of $100 ("Capital Contribution") and provide the Company with a $200,000 revolving line of credit pursuant to the terms set forth in the Secured Note and Agreement attached hereto as Exhibit A. ("**Member Loan**").



FILED DATE: 1/21/2021 9:08 AM   2019L013339

*~~34,000~~ 39,000* ✓✓

3.  <u>Issuance of Membership Interests/Units</u>.  Company hereby ~~issues~~ to Okun 34,000 Units of the Company.  Upon issuance of the ~~foregoing~~ ~~347,000~~ Units to Okun, each of Okun and Isaacson will own 67,000 Units, each representing a 50% Percentage Interest.

4.  <u>Member Loan</u>.   Concurrently herewith, the Company will deliver to Okun the Secured Note and Agreement evidencing the Member Loan in the form attached hereto as <u>Exhibit A</u>.  Company agrees that all "Advances" under the Secured Note and Agreement shall be used solely for working capital purposes.

5.  <u>Representations and Warranties of the Company And Isaacson</u>.  In order to induce Okun to make and commit to the Capital Contribution Member Loan, Company and Isaacson represent, warrant, jointly and severally, and agree that the following are true and correct on the date hereof and as of the date hereof:

(a)   <u>Balance Sheet</u>.  Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Company's balance sheet as of May 31, 2017 (the "**Balance Sheet**").

(b)   <u>Undisclosed Liabilities</u>.  Except as set forth in the Balance Sheet, the Company has as of the date of the Closing Balance Sheet no liabilities or obligations of any nature or kind, whether accrued, absolute, contingent or otherwise related to the Business or the Company.

(c)   <u>Operation of Business</u>.  Since October 13, 2016, (a) the Company has conducted the Business consistent with existing and historical operating procedures and practices; and (b) there has not been any (i) material damage, destruction, loss, condemnation or changes in the condition (financial or otherwise), whether or not covered by insurance, of the assets, liabilities or personnel of the Company business or any change in the relationship of the Company with its employees, suppliers, customers or others, other than changes in the usual, regular and ordinary course of business; or (ii) event, circumstance or condition that has had, or is reasonably likely to have, a material, adverse effect on the financial condition, business, cash flows, assets, liabilities, prospects or properties of the Company.

(d)   <u>Compliance with Laws</u>.  The Company has complied with all laws applicable to the Company.  Neither the Company nor Isaacson has had notice or knowledge of any violation of any law applicable to the Company.

(e)   <u>Litigation</u>.   There is no claim, action, suit, proceeding, dispute or investigation pending or, to the best of the Company's or Isaacson's knowledge, threatened before any court, any arbitrator of any nature, or any Governmental Authority, department, commission, board, agency or instrumentality, brought by or against the Company, Isaacson, its affiliates, officers, directors or employees, involving, affecting or relating to any of, the Company.  Neither the Company nor Isaacson has knowledge of any basis for any such claim, action, suit, proceeding, dispute or investigation.  No claim, action, suit, proceeding, dispute or investigation has resulted in any order, injunction or decree against the Company.

- 2 -

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(f)    Due Diligence Materials.    There are no documents or information regarding the Company and the Business which may be material to Okun and which have not been disclosed to Okun, regardless of whether or not such information was requested by Okun.  No representation or warranty or other statement by the Company or Isaacson in this Agreement contains any untrue statement of a material fact, or to the knowledge of the Company or Isaacson, omits to state a material fact necessary in order to make any such statement contained herein or therein not misleading in light of the circumstances in which it was made.

6.    Amendment to Operating Agreement.    Exhibit A of the Operating Agreement shall be deleted in its entirety and replaced with the Exhibit C attached hereto, which takes into account the Capital Contribution and issuance of 34,000 Units to Okun pursuant to this Agreement.

7.    MISCELLANEOUS.

(a)    Assignment.  The rights, duties and privileges of the parties shall not be transferred or assigned in whole or in part without the prior written consent of the other party.

(b)    Entire Agreement.  This Agreement including the Exhibits referred to herein and to be delivered pursuant to this Agreement, sets forth the entire agreement among the parties and merges and supersedes all prior discussions and agreements among them with respect to the subject matter hereof.  Neither party shall be bound by any condition, definition, warranty or representation with respect to any term or condition other than those provided for in this Agreement or the documents and Exhibits referred to herein or delivered pursuant to this Agreement or as amended by subsequent agreement in writing signed by the parties or a duly authorized officer or representative of the parties to this Agreement.

(c)    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors and permitted assigns.

(d)    Invalid Provision.  In the event that any provision of this Agreement is held to be invalid or illegal for any reason, such determination shall not affect the remaining provisions which shall be construed and enforced as if such illegal or invalid provision had never been included.

(e)    Applicable Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS.

(f)    Pronouns.  The singular form denotes the plural and the masculine form denotes the feminine or neuter wherever appropriate.



FILED DATE: 1/21/2021 9:08 AM   2019L013339

(g)    Descriptive Headings.  All section headings, titles and subtitles contained herein are inserted for convenience and reference only and are to be ignored in any construction of the provisions hereof.

(h)    Legal Action.  In any action at law or in equity arising out of this Agreement and the transactions contemplated hereunder, the prevailing party shall be entitled to reasonable attorney's fees and court costs in addition to any other relief to which it may be entitled.

(i)    Waiver.  Any party may waive any term, condition or requirement under this Agreement or the Exhibits hereto which is intended for its own benefit, and any waiver of any term or condition of this Agreement or the Exhibits hereto shall not operate as a waiver of any other breach of such term or condition, nor shall any failure to enforce any provision hereof or of the Exhibits hereto operate as a waiver of such provision or of any other provision hereof or the Exhibits hereto.

(j)    Further Assurances.  Each party agrees to perform any further acts and execute and deliver any further documents which may be reasonably necessary to carry out the provisions of this Agreement.

(k)    Disputes.  Except for matters for which injunctive relief is appropriate, in the event of any dispute regarding the terms of this Agreement, the matter shall be submitted in writing to binding arbitration in Chicago, Illinois, in accordance with the rules of the American Arbitration Association or such other arbitrator as may be mutually agreed upon by the parties to the dispute.  All parties shall be provided a copy of any such request for arbitration.  The prevailing party shall recover reasonable attorneys' fees and cost of arbitration in the award rendered by the arbitrator.  The decision of the arbitrator shall be final and binding and not subject to judicial review, but may be submitted to any court of competent jurisdiction for enforcement in accordance with its terms.

(l)    Counterparts, Facsimile and E-mail Transmission.  This Agreement may be signed in any number of counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.  The Parties may sign and deliver this Agreement by facsimile transmission, or by e-mail with attached scanned signature page image.  Each of the Parties agree that they shall have the same force and effect as delivery of original signatures and that each of the Parties may use such signatures as evidence of the execution and delivery of this Agreement by all Parties to the same extent that an original signature could be used.

(m)    Incorporation.  The Recitals contained herein, and the Exhibits attached hereto are hereby incorporated and made a part of the terms and mutual covenants and agreements contained in this Agreement.

The parties have executed this Agreement as of the date first above written.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

**COMPANY:**

THE PREMIER PROPERTY TEAM, LLC, ,
an Illinois limited liability company

By: _____
        Barry Isaacson, Member

By:  Michael D. Okun Revocable Trust u/a/d December 27,
2012 as amended,  a Member

        By: _____
              Michael D. Okun, Trustee

**ISAACSON:**

_____
Barry Isaacson

**OKUN:**

MICHAEL  D.  OKUN  REVOCABLE  TRUST  U/A/D
DECEMBER 27, 2012 AS AMENDED

        By: _____
              Michael D. Okun, Trustee

# Exhibit C

FILED DATE: 1/21/2021 9:08 AM   2019L013339

### EXHIBIT A

### SECURED NOTE AND AGREEMENT

### SECURED PROMISSORY NOTE AND AGREEMENT ("NOTE")

**June 12, 2017**                                                        **$200,000**

FOR VALUE RECEIVED, THE PREMIER PROPERTY TEAM LLC, an Illinois limited liability company ("Borrower"), hereby promises to pay to the order of MICHAEL D. OKUN REVOCABLE TRUST DATED DECEMBER 27, 2012, AS AMENDED ("Lender") at such place or places as Lender may from time to time designate the unpaid principal amount of all Advances (as defined below) from time to time made by Lender to Borrower under the terms of this Note (the "Maximum Loan Limit"), together with all accrued and unpaid interest thereon.

1.    _Advances_.  Subject to the terms and conditions of this Note, Lender agrees that it will, upon the request or requests of Borrower, make loan Advances to Borrower in such amounts requested by Borrower (collectively, "Advances"), provided however that the principal amount of all outstanding Advances hereunder shall at no time exceed $200,000, and further provided the Advances shall be used by Borrower solely for working capital purposes.  Such loan Advances shall be evidenced by this Note.

2.    _Interest_.

• _Interest_.  Interest on this Note shall accrue and be payable on the outstanding principal amount of each Advance at the annual rate of eight percent (8.00%) from the date hereof through the Maturity Date (as defined below). *6% [handwritten]*

• _Interest Calculation_.  Interest on this Note shall be calculated on the basis of a 360-day year and the actual number of days elapsed in any portion of a month in which interest is due. *11% [handwritten]*

• _Interest After Event of Default_.  From and after the Maturity Date or upon the occurrence and during the continuance of an Event of Default (as defined below), interest shall accrue on the unpaid principal balance during any such period at an annual rate (the "Default Rate") equal to thirteen percent (13.00%); provided, however, in no event shall the Default Rate exceed the maximum rate permitted by law.  The interest accruing under this subsection shall be immediately due and payable by Borrower to the holder of this Note upon demand and shall be additional indebtedness evidenced by this Note.

3.    _Payment of Principal and Interest_.  Principal payments and accrued interest due under this Note, if not sooner declared to be due in accordance with the provisions hereof, shall be made as follows:

(a)    the payments of accrued interest only shall be payable on the principal amount of each Advance on the first day of each month until payment in full hereof; and

- 6 -

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(b)     the entire outstanding balance of principal on Advances together with accrued and unpaid interest shall be due and payable on June 12, 2019 (the "Maturity Date.

4.     Prepayment.  At the option of Borrower, at any time or times prior to the Maturity Date, all or any portion of the unpaid principal sum and accrued interest on this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to the unpaid principal.

5.     Mandatory Payments.  So long as any indebtedness remains outstanding under this Note, Borrower shall make a mandatory prepayment of unpaid principal and accrued interest outstanding hereunder upon the consummation of a Sale Event (as defined below), Borrower shall make a mandatory prepayment of all unpaid principal and accrued interest outstanding under this Note.  As used herein, the term "Sale Event" means (i) a sale of all or substantially all of the assets of Borrower, or (ii) a sale of any equity interests by Borrower or any equity owner, or a merger, consolidation, business combination or other transaction, any of which sale or other transaction results in the current equity holders collectively owning less than 50% of the outstanding equity of Borrower.

6.     Borrower Restrictions.  So long as any indebtedness remains outstanding under this Note, Borrower will not, directly or indirectly without the prior consent of Lender, acquire, redeem or retire or declare, make or pay any distribution, dividend or other payment with respect to Borrower's equity interests.

7.     Security Interest.  To secure the payment of all indebtedness and/or obligations due or to become due, now existing or hereafter arising under this Note and any extensions or renewals thereto, Borrower hereby grants, conveys and delivers to Lender a continuing and unconditional subordinated security interest in and to the assets and property of Borrower described on Exhibit A attached hereto and incorporated herein (collectively, the "Collateral"). From the date hereof through and until the date that the principal, accrued interest and all other obligations under this Note has been paid in full, Borrower hereby agrees as follows:

(a)     Lender is authorized to file such financing statements or other instruments to evidence, perfect, and continue the security interest granted hereunder; and

(b)     Borrower is and shall continue to be the owner of the Collateral free and clear of any lien, security interest, encumbrance or claim of any kind other than the lien of Lender.

This Note is intended to be a financing statement within the purview of Section 9-502(b) of the Illinois Uniform Commercial Code with respect to the Collateral. The Collateral set forth herein is intended to consist of "all assets" of Borrower and may be so-stated on any financing statements filed by Seller from time to time.

8.     Events of Default.  The occurrence of any one or more of the following events shall constitute an event of default hereunder ("Event of Default"):



- 7 -

FILED DATE: 1/21/2021 9:08 AM   2019L013339

     (a)    If Borrower fails to pay when due any portion of the principal or interest on this Note when due;

     (b)    If, pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency or relief of debtors (a "Bankruptcy Law"), Borrower shall: (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of its creditors; or (v) admit in writing its inability to pay its debts as they become due and such event is not dismissed or cured within thirty (30) calendar days; or

     (c)    If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, or (ii) appoints a trustee, receiver, assignee, liquidator or similar official for Borrower or substantially all of Borrower's properties, and the order or decree is not dismissed within thirty (30) calendar days.

9.    <u>Remedies</u>.  At the election of Lender hereof, the principal balance and all unpaid interest accrued thereon remaining unpaid under this Note, and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default.  Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default.  Lender shall not, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.  The rights, remedies and powers of the holder hereof, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against Borrower all at the sole discretion of the holder hereof.  If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, then the prevailing party shall be entitled to reasonable attorneys' fees and court costs.

10.    <u>Covenants and Waivers</u>.  Borrower: (a) waives presentment and demand for payment; (b) waives any and all lack of diligence and delays in the enforcement of the payment hereof; and (c) consents to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions hereof.

11.    <u>Other General Agreements</u>.

     (a)    THIS NOTE IS GOVERNED AND CONTROLLED AS TO VALIDITY, ENFORCEMENT, INTERPRETATION, CONSTRUCTION, EFFECT AND IN ALL OTHER RESPECTS BY THE STATUTES, LAWS AND DECISIONS OF THE STATE OF ILLINOIS.  This Note may only be changed or amended orally but only by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

     (b)    This Note shall inure to the benefit of and may be enforced by Lender and its heirs, legal representatives, successors and assigns.

- 8 -



FILED DATE: 1/21/2021 9:08 AM   2019L013339

(c)     If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

(d)     Lender may at any time assign its rights to receive payment under this Note without the consent of Borrower.  Borrower may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender.

12.     **Consent to Jurisdiction**.  ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN COOK COUNTY, ILLINOIS.

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the day and year first written above.


**BORROWER:**

MICHAEL D. OKUN REVOCABLE TRUST
LLC DATED DECEMBER 27, 2012

By: _____
        Michael D. Okun, Trustee

**LENDER**

THE PREMIER PROPERTY TEAM

By: _____
        Barry Isaacson, Manager



FILED DATE: 1/21/2021 9:08 AM   2019L013339

## EXHIBIT A
## COLLATERAL

All property of Borrower, as aforesaid, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and Proceeds therefrom, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, and all of the books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of Borrower's respective right, title and interests in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media, identified and set forth as follows:

(a)     All Accounts and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by Borrower, or rejected or refused by an Account Borrower.

(b)     All Inventory, including raw materials, work-in-process and finished goods and all assets held for sale or lease.

(c)     All goods, including embedded software, equipment, vehicles, furniture and fixtures.

(d)     All software and computer programs, all books and records of any type or set forth in any media.

(e)     All securities, investment property, financial assets and deposit accounts.

(f)     All chattel paper, instruments, documents and general intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchise, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, security interests, security deposits and rights to indemnification), tax refunds, notes, instruments, bills of lading, warehouse receipts, shipping documents, documents and documents of title, instruments, documents, letter of credit rights, all proceeds of letters of credit, supporting obligations, notes secured by real estate, tax refunds or claims therefor, commercial tort claims, rights under all equipment lease agreements (including financing costs), all eminent domain or condemnation awards and general intangibles, including payment intangibles.

(g)     All negotiable and nonnegotiable documents of title covering any Collateral.

(h)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

(i)     To the extent permitted by applicable law, the Collateral is specifically intended to cover all leases between Borrower or its agents as lessee, and various landlords named therein as landlords ("Leases"), including all extended terms and all extensions and renewals of the terms thereof, as well as any amendments to or replacement of the Leases.

(j)     All deposit accounts, bank accounts, deposits and cash, all of Borrower's monies, and any and all other property and interests in property of Borrower, including, without limitation, investment property, instruments, security entitlements, uncertificated securities, certificated securities, cash equivalent investments, financial assets.

(k)     All substitutes or replacements for any Collateral, all Proceeds (whether cash Proceeds or noncash Proceeds) of the foregoing property, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums) from the sale, destruction, loss or other disposition of any of the Collateral and sums due from a third party which as damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

Except as defined in the Note, the terms used above shall have the meanings provided in the Illinois Uniform Commercial Code.



FILED DATE: 1/21/2021 9:08 AM   2019L013339

## EXHIBIT B

## BALANCE SHEET

FILED DATE: 1/21/2021 9:08 AM  2019L013339

## EXHIBIT C

## AMENDED EXHIBIT A (dated June 12, 2017)

|  | Common Units | Percentage Interest | Capital Contribution |
|---|---|---|---|
| **Members:** |  |  |  |
| Barry Isaacson | 67,000 | 50% | $  0 |
| Michael D Okun Revocable Trust u/a/d December 27, 2012 as amended | 67,000 | 50% | $225,100 |
| **TOTAL:** | 134,000 | 100% | $225,100 |



FILED DATE: 1/21/2021 9:08 AM   2019L013339

# EXHIBIT C

FILED DATE: 1/21/2021 9:08 AM   2019L013339

## SECURED PROMISSORY NOTE AND AGREEMENT ("NOTE")

June 12, .2017                                                                  $200,000

FOR VALUE RECEIVED, THE PREMIER PROPERTY TEAM LLC, an Illinois limited liability company ("Borrower"), hereby promises to pay to the order of MICHAEL D. OKUN REVOCABLE TRUST DATED DECEMBER 27, 2012, AS AMENDED ("Lender") at such place or places as Lender may from time to time designate the unpaid principal amount of all Advances (as defined below) from time to time made by Lender to Borrower under the terms of this Note (the "Maximum Loan Limit"), together with all accrued and unpaid interest thereon.

1.   Advances: Subject to the terms and conditions of this Note, Lender agrees that it will, upon the request or requests of Borrower, make loan Advances to Borrower in such amounts requested by Borrower (collectively, "Advances"), provided however that the principal amount of all outstanding Advances hereunder shall at no time exceed $200,000, and further provided the Advances shall be used by Borrower solely for working capital purposes. Such loan Advances shall be evidenced by this Note.

2.   Interest.

(a)   Interest. Interest on this Note shall accrue and be payable on the outstanding principal amount of each Advance at the annual rate of eight percent (8.00%) from the date hereof through the Maturity Date (as defined below).

(b)   Interest Calculation. Interest on this Note shall be calculated on the basis of a 360-day year and the actual number of days elapsed in any portion of a month in which interest is due

(c)   Interest After Event of Default. From and after the Maturity Date or upon the occurrence and during the continuance of an Event of Default (as defined below), interest shall accrue on the unpaid principal balance during any such period at an annual rate (the "Default Rate") equal to thirteen percent (13.00%); provided, however, in no event shall the Default Rate exceed the maximum rate permitted by law. The interest accruing under this subsection shall be immediately due and payable by Borrower to the holder of this Note upon demand and shall be additional indebtedness evidenced by this Note.

3.   Payment of Principal and Interest. Principal payments and accrued interest due under this Note, if not sooner declared to be due in accordance with the provisions hereof, shall be made as follows:

(a)   the payments of accrued interest only shall be payable on the principal amount of each Advance on the first day of each month until payment in full hereof; and

(b)   the entire outstanding balance of principal on Advances together with accrued and unpaid interest shall be due and payable on June 12, 2019 (the "Maturity Date.

FILED DATE: 1/21/2021 9:08 AM   2019L013339

4.   Prepayment.  At the option of Borrower, at any time or times prior to the Maturity Date, all or any portion of the unpaid principal sum and accrued interest on this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to the unpaid principal.

5.   Mandatory Payments.  So long as any indebtedness remains outstanding under this Note, Borrower shall make a mandatory prepayment of unpaid principal and accrued interest outstanding hereunder upon the consummation of a Sale Event (as defined below), Borrower shall make a mandatory prepayment of all unpaid principal and accrued interest outstanding under this Note.  As used herein, the term "Sale Event" means (i) a sale of all or substantially all of the assets of Borrower, or (ii) a sale of any equity interests by Borrower or any equity owner, or a merger, consolidation, business combination or other transaction, any of which sale or other transaction results in the current equity holders collectively owning less than 50% of the outstanding equity of Borrower.

6.   Borrower Restrictions.  So long as any indebtedness remains outstanding under this Note, Borrower will not, directly or indirectly without the prior consent of Lender, acquire, redeem or retire or declare, make or pay any distribution, dividend or other payment with respect to Borrower's equity interests.

7.   Security Interest.  To secure the payment of all indebtedness and/or obligations due or to become due, now existing or hereafter arising under this Note and any extensions or renewals thereto, Borrower hereby grants, conveys and delivers to Lender a continuing and unconditional subordinated security interest in and to the assets and property of Borrower described on Exhibit A attached hereto and incorporated herein (collectively, the "Collateral"). From the date hereof through and until the date that the principal, accrued interest and all other obligations under this Note has been paid in full, Borrower hereby agrees as follows:

   (a)   Lender is authorized to file such financing statements or other instruments to evidence, perfect, and continue the security interest granted hereunder; and

   (b)   Borrower is and shall continue to be the owner of the Collateral free and clear of any lien, security interest, encumbrance or claim of any kind other than the lien of Lender.

This Note is intended to be a financing statement within the purview of Section 9-502(b) of the Illinois Uniform Commercial Code with respect to the Collateral.  The Collateral set forth herein is intended to consist of "all assets" of Borrower and may be so-stated on any financing statements filed by Seller from time to time.

8.   Events of Default.  The occurrence of any one or more of the following events shall constitute an event of default hereunder ("Event of Default"):

   (a)   If Borrower fails to pay when due any portion of the principal or interest on this Note when due;

   (b)   If, pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency or relief of debtors (a

2



FILED DATE: 1/21/2021 9:08 AM   2019L013339

"Bankruptcy Law"), Borrower shall: (i) commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it an involuntary case; (iii) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official; (iv) make an assignment for the benefit of its creditors; or (v) admit in writing its inability to pay its debts as they become due and such event is not dismissed or cured within thirty (30) calendar days; or

(c)   If a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against Borrower in an involuntary case, or (ii) appoints a trustee, receiver, assignee, liquidator or similar official for Borrower or substantially all of Borrower's properties, and the order or decree is not dismissed within thirty (30) calendar days.

9.   Remedies.  At the election of Lender hereof, the principal balance and all unpaid interest accrued thereon remaining unpaid under this Note, and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default.  Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default.  Lender shall not, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein.  The rights, remedies and powers of the holder hereof, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against Borrower all at the sole discretion of the holder hereof.  If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, then the prevailing party shall be entitled to reasonable attorneys' fees and court costs.

10.   Covenants and Waivers.  Borrower: (a) waives presentment and demand for payment; (b) waives any and all lack of diligence and delays in the enforcement of the payment hereof; and (c) consents to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions hereof.

11.   Other General Agreements.

(a)   THIS NOTE IS GOVERNED AND CONTROLLED AS TO VALIDITY, ENFORCEMENT, INTERPRETATION, CONSTRUCTION, EFFECT AND IN ALL OTHER RESPECTS BY THE STATUTES, LAWS AND DECISIONS OF THE STATE OF ILLINOIS.  This Note may only be changed or amended orally but only by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

(b)   This Note shall inure to the benefit of and may be enforced by Lender and its heirs, legal representatives, successors and assigns.

(c)   If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the

3



FILED DATE: 1/21/2021 9:08 AM    2019L013339

purpose of this and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

(d)    Lender may at any time assign its rights to receive payment under this Note without the consent of Borrower.  Borrower may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender.

12.    **Consent to Jurisdiction**.  ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN COOK COUNTY, ILLINOIS.

IN WITNESS WHEREOF, Borrower has executed and delivered this Note as of the day and year first written above.

**BORROWER:**

MICHAEL D. OKUN REVOCABLE TRUST
LLC DATED DECEMBER 27, 2012

By: _____
    Michael D. Okun, Trustee

**LENDER**

THE PREMIER PROPERTY TEAM

By: _____
    Barry Isaacson, Manager

4

FILED DATE: 1/21/2021 9:08 AM   2019L013339

# EXHIBIT A

## COLLATERAL

All property of Borrower, as aforesaid, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and Proceeds therefrom, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, and all of the books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of Borrower's respective right, title and interests in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media, identified and set forth as follows:

(a)    All Accounts and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by Borrower, or rejected or refused by an Account Borrower.

(b)    All Inventory, including raw materials, work-in-process and finished goods and all assets held for sale or lease.

(c)    All goods, including embedded software, equipment, vehicles, furniture and fixtures.

(d)    All software and computer programs, all books and records of any type or set forth in any media.

(e)    All securities, investment property, financial assets and deposit accounts.

(f)    All chattel paper, instruments, documents and general intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchise, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, security interests, security deposits and rights to indemnification), tax refunds, notes, instruments, bills of lading, warehouse receipts, shipping documents, documents and documents of title, instruments, documents, letter of credit rights, all proceeds of letters of credit, supporting obligations, notes secured by real estate, tax refunds or claims therefor, commercial tort claims, rights under all equipment lease agreements (including financing costs), all eminent domain or condemnation awards and general intangibles, including payment intangibles.

(g)    All negotiable and nonnegotiable documents of title covering any Collateral.

(h)    All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.



FILED DATE: 1/21/2021 9:08 AM   2019L013339

(i)    To the extent permitted by applicable law, the Collateral is specifically intended to cover all leases between Borrower or its agents as lessee, and various landlords named therein as landlords ("Leases"), including all extended terms and all extensions and renewals of the terms thereof, as well as any amendments to or replacement of the Leases.

(j)    All deposit accounts, bank accounts, deposits and cash, all of Borrower's monies, and any and all other property and interests in property of Borrower, including, without limitation, investment property, instruments, security entitlements, uncertificated securities, certificated securities, cash equivalent investments, financial assets.

(k)    All substitutes or replacements for any Collateral, all Proceeds (whether cash Proceeds or noncash Proceeds) of the foregoing property, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums) from the sale, destruction, loss or other disposition of any of the Collateral and sums due from a third party which as damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

Except as defined in the Note, the terms used above shall have the meanings provided in the Illinois Uniform Commercial Code.

6



# Exhibit D

**Archived:** Thursday, December 8, 2022 2:42:41 PM
**From:** Michael Okun
**Sent:** Sat, 3 Dec 2022 20:22:00
**To:** D. LeVay Brian (BLeVay@LLFLegal.com); Adam P. Silverman
**Subject:** FW: Premier
**Sensitivity:** Normal

---

**From:** Michael Okun
**Sent:** Tuesday, August 20, 2019 5:31 PM
**To:** Barry Isaacson <barry@premiergroupusa.net>; margo@premiergroupusa.net
**Cc:** Blevay@llflegal.com; 'Michael Blitstein' <michael@cjbs.com>
**Subject:** Premier

Barry & Margo,
The IRS is not showing that you filed taxes for Premier for the 2018 tax year.
Did you file ? Was 2017 filed ?
Was the returns sent in electronically or mailed ?

Also, as you know you are in violation of the line of credit and have many violations of the operating agreement. (per the line of credit agreement and the operating agreement).
Therefore we are entitled to and are requesting the following:
- We need all copies of all the books and records.
- We need all past and current bank statements.
- We need all the passwords for all the bank accounts so we have access.

We are going to be conducting a forensic audit on the Company(s) so I am sure we will be asking for other things.

Margo,
Can you please get everything together by end of day tomorrow.
I am sure most can emailed to us.
If we need to pick up anything just let us know.
When sending please reply to all.

Thanks

Michael


**Michael Okun**

**Direct   1-847-541-0206**
**Cell     1-847-651-6586**
**www.contempinc.com**

# Exhibit E

**Archived:** Thursday, December 8, 2022 2:42:44 PM
**From:** Michael Okun
**Sent:** Sat, 3 Dec 2022 20:13:52
**To:** D. LeVay Brian (BLeVay@LLFLegal.com); Adam P. Silverman
**Subject:** FW: MDO Open Items for company tax returns
**Sensitivity:** Normal

---

On May 11, 2019, at 9:28 AM, Michael Okun <mike@contempinc.com> wrote:

We only received the final one for Premier mosquito which that companies close so it doesn't matter it's Premier properties he needs the 2018 tax return that was filed
Thanks


**Michael Okun**
**Contemporary Marketing, Inc.**
**1569 Barclay Blvd.**
**Buffalo Grove, IL. 60089**

**Office**   **1-847-541-0330**
**Direct**   **1-847-541-0206**
**Cell**     **1-847-651-6586**
**www.contempinc.com**

On May 11, 2019, at 9:24 AM, Barry <barry@premiergroupusa.net> wrote:

I sent before but will send Monday am.
And yes I diagnosed and with Tech building now has hot water.

Sent from my iPhone

On May 11, 2019, at 8:27 AM, Michael Okun <mike@contempinc.com> wrote:

Hi Barry,
Why are you and your bother always the last to get me info?
Can you please send me the 2018 company tax returns that were filed for Premier Property.
Thanks
Michael

**Michael Okun**
**Contemporary Marketing, Inc.**
**1569 Barclay Blvd.**
**Buffalo Grove, IL. 60089**

**Office**     **1-847-541-0330**
**Direct**     **1-847-541-0206**
**Cell**       **1-847-651-6586**
**www.contempinc.com**

# Exhibit F

**Archived:** Thursday, December 8, 2022 2:42:47 PM
**From:** Michael Okun
**Sent:** Sat, 3 Dec 2022 20:07:13
**To:** D. LeVay Brian (BLeVay@LLFLegal.com); Adam P. Silverman
**Subject:** FW: Tax returns that were just filed
**Sensitivity:** Normal

---

**From:** Michael Okun
**Sent:** Monday, August 26, 2019 1:46 PM
**To:** margo@premiergroupusa.net; Barry Isaacson <barry@premiergroupusa.net>
**Cc:** 'Michael Blitstein' <michael@cjbs.com>; Blevay@llflegal.com
**Subject:** Tax returns that were just filed

Hi Margo,
Per our conversation, please scan and send over the full tax returns that you filed for 2017 & 2018 with all k-1's. etc.
I know you & Barry did not file anything until last week and we need to see exactly what was sent in.
Thank you

Michael


**Michael Okun**

**Direct    1-847-541-0206**
**Cell      1-847-651-6586**
**www.contempinc.com**

# Exhibit G

**Archived:** Thursday, December 8, 2022 2:42:49 PM
**From:** Michael Okun
**Sent:** Sat, 3 Dec 2022 20:20:08
**To:** D. LeVay Brian (BLeVay@LLFLegal.com); Adam P. Silverman
**Subject:** FW: Returns
**Sensitivity:** Normal

---

**From:** Michael Okun
**Sent:** Tuesday, August 27, 2019 10:19 AM
**To:** Barry Isaacson <barry@premiergroupusa.net>
**Subject:** RE: Returns

Please forward what was mailed

**From:** Barry Isaacson <barry@premiergroupusa.net>
**Sent:** Tuesday, August 27, 2019 8:58 AM
**To:** Michael Okun <mike@contempinc.com>
**Subject:** Returns

Returns sent are the same you were sent originally, so you already have them.

*Barry Isaacson*
428 S. Vermont St
Palatine, IL  60067
Cell 847-370-4339
Office  224-801-6930  Fax 847-348-2525



THE PREMIER PROPERTY TEAM, LLC

# Exhibit H

**Archived:** Thursday, December 8, 2022 2:42:52 PM
**From:** Michael Okun
**Sent:** Sat, 3 Dec 2022 20:18:34
**To:** D. LeVay Brian (BLeVay@LLFLegal.com); Adam P. Silverman
**Subject:** FW: Balance owed
**Sensitivity:** Normal

---

**From:** Michael Okun
**Sent:** Friday, November 15, 2019 4:14 PM
**To:** 'Barry' <barry@premiergroupusa.net>
**Cc:** margo@premiergroupusa.net; Blevay@llflegal.com
**Subject:** RE: Balance owed

Barry,
You continue to ignore my emails.
I have been more then patience with you.
As stated before, I need an accounting of everything and I am still waiting.
I was hoping you would do the right thing and I even gave you two extra weeks.
You are leaving me no other choice but to move forward.

Michael

**From:** Michael Okun
**Sent:** Tuesday, October 29, 2019 7:39 PM
**To:** 'Barry' <barry@premiergroupusa.net>
**Cc:** margo@premiergroupusa.net
**Subject:** Balance owed

Barry,
As you are well aware, you are months behind on my interest payments.
I have given you more then enough time to bring me current.
You need to bring me current by 11/1 or I will be turning everything over to my attorney.

Michael

**Michael Okun**
**Direct    1-847-541-0206**
**Cell      1-847-651-6586**

# Exhibit I

**Archived:** Thursday, December 8, 2022 2:42:54 PM
**From:** Michael Okun
**Sent:** Sat, 3 Dec 2022 20:17:36
**To:** D. LeVay Brian (BLeVay@LLFLegal.com); Adam P. Silverman
**Subject:** FW: K-1 for Premier Property
**Sensitivity:** Normal

---

**From:** Michael Okun
**Sent:** Friday, October 09, 2020 2:16 PM
**To:** 'Barry' <barry@premiergroupusa.net>
**Cc:** Blevay@llflegal.com; michael@cjbs.com
**Subject:** RE: K-1 for Premier Property

Barry
Please send K-1 ASAP
My accountant needs it.
Thanks
Michael



**Michael Okun**
President / CEO | Contemporary Marketing, Inc. | 1569 Barclay Blvd, Buffalo Grove, IL 60089
Direct: (847) 541-0206 | Main Office: (847) 541-0330 | Mobile: (847) 651-OKUN(6586)

Email: Mike@contempinc.com | Website: www.contempinc.com | **'AS SEEN ON THE PROFIT'** 

---

**From:** Michael Okun
**Sent:** Friday, September 18, 2020 12:59 PM
**To:** 'Barry' <barry@premiergroupusa.net>
**Cc:** Blevay@llflegal.com
**Subject:** K-1 for Premier Property

Barry,
To date we have not received the K-1 for Premier Property Team.
Please forward ASAP
Thanks

Michael



**Michael Okun**
President / CEO | Contemporary Marketing, Inc. | 1569 Barclay Blvd, Buffalo Grove, IL 60089
Direct: (847) 541-0206 | Main Office: (847) 541-0330 | Mobile: (847) 651-OKUN(6586)

Email: Mike@contempinc.com | Website: www.contempinc.com | **'AS SEEN ON THE PROFIT'** 

# Exhibit J

**Archived:** Thursday, December 8, 2022 2:42:57 PM
**From:** Michael Okun
**Sent:** Sat, 3 Dec 2022 20:17:09
**To:** D. LeVay Brian (BLeVay@LLFLegal.com); Adam P. Silverman
**Subject:** FW: K-1's needed for Premier Property 2019 & 2020
**Sensitivity:** Normal

---

**From:** Michael Okun
**Sent:** Monday, April 05, 2021 9:15 AM
**To:** 'Barry' <barry@premiergroupusa.net>
**Cc:** Blevay@llflegal.com; Robert Carroll <Rcarroll@llflegal.com>
**Subject:** K-1's needed for Premier Property 2019 & 2020

Barry,
Still waiting for the K-1 for 2019 and now need the K-1 for 2020.
We need them forwarded ASAP.



**Michael Okun**
President / CEO | Contemporary Marketing, Inc. | 1569 Barclay Blvd, Buffalo Grove, IL 60089
Direct: (847) 541-0206 | Main Office: (847) 541-0330 | Mobile: (847) 651-OKUN(6586)

Email: Mike@contempinc.com |Website: www.contempinc.com | 'AS SEEN ON THE PROFIT'